RON LAPIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lapin v. Commissioner
Docket No. 10973-89
United States Tax Court
T.C. Memo 1990-343; 1990 Tax Ct. Memo LEXIS 370; 60 T.C.M. (CCH) 59; T.C.M. (RIA) 90343; July 9, 1990, Filed *370 Decision will be entered under Rule 155. Ronald K. Van Wert, for the petitioner. Alice M. Harbutte, for the respondent. FEATHERSTON, Judge. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: [1] Additions to Tax, I.R.C. Sections Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
1982
$ 73,729
$ 3,686 *
$ 18,432
1983
15,148  --
-- --
For 1982, respondent also determined an increased interest rate under section 6621(c) (formerly section 6621(d)) for a substantial underpayment attributable to a tax motivated transaction. After concessions by both parties, the issues remaining for decision are: (1) whether petitioner for 1983 is entitled to a section 165 deduction for a theft loss or an abandonment loss, or neither, for $ 60,000 invested in a limited partnership in 1981; (2) whether the 25-percent rate of section 6661, which Congress increased *371 from 10 percent in 1986, can be constitutionally applied to petitioner's 1982 taxable year; and (3) whether respondent abused his discretion in not waiving the section 6661 addition to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Among the stipulations are the findings of fact in Ferrell v. Commissioner, 90 T.C. 1154 (1988), which, in addition to the written stipulation of facts and attached exhibits, are incorporated herein by reference. At the time he filed the petition in this case, petitioner, Dr. Ron Lapin, resided in Norwalk, California. The tax returns for the years at issue were filed with the Internal Revenue Service Center at Fresno, California. [2] Petitioner at all relevant times was a surgeon, with special expertise in the area of artificial blood, who at least *372 through 1982 typically worked long hours each week. From 1981 to 1983, petitioner traveled overseas to Holland approximately 11 times to complete work on his Ph.D. degree. Beginning in about 1974, petitioner retained an accountant, Bob Strathern (Strathern), to assist in petitioner's financial affairs, which soon included investments. Prior to that time, petitioner had not been involved with investments. Strathern had been recommended to petitioner by two fellow physicians at Fountain Valley Hospital. They had described Strathern to petitioner as an excellent accountant, a former Internal Revenue Service (IRS) agent, and a genius. Petitioner instructed Strathern that, in evaluating a potential investment, he was to research the investment with the long term in mind and ensure that it was legal and economically viable. Petitioner also directed Strathern, at least for 1980 and following years, to clear any of his recommended investments with the Sandy Brickner (Brickner) law firm. Strathern generally reviewed potential investments of his own choosing. Petitioner first made an oil and gas investment, through Strathern, in about 1976. In 1981, Strathern recommended that petitioner *373 invest in a limited partnership called Western Reserve Oil and Gas Co., Ltd. (Western Reserve). In presenting his recommendation, Strathern described both economic benefits and tax advantages. Regarding the economics, Strathern told petitioner that Western Reserve had substantial proven oil and gas reserves, that oil prices would be increasing, and that the management of Western Reserve was experienced in the oil business. Strathern also said that a number of the accounting people were ex-IRS employees. In December of 1981, petitioner invested $ 60,000 cash in Western Reserve through a grantor trust called the Ron Lapin Revocable Trust. Petitioner first learned that Strathern was not totally independent of his recommended investments in about 1982, when a third party informed petitioner that Strathern was a general partner in one of petitioner's other partnership investments. Later, petitioner learned that Strathern had received a commission for petitioner's investment in a venture called Sentinel, that petitioner was paying "hidden costs" for some investments, and, ultimately, that Strathern had received a commission on petitioner's Western Reserve investment. Petitioner would *374 not have invested in Western Reserve if he had known about the commission Strathern was to receive. Strathern was an authorized signatory for a corporation called Ron Lapin, M.D., Inc. Petitioner discovered in 1982 that Strathern had been drawing funds out of the corporation in 1981 and 1982 without authorization. Petitioner then terminated his working relationship with Strathern. Either at the end of 1982 or in 1983, petitioner filed a lawsuit against Strathern based on allegations of fraud, mismanagement, and failure to release documents. In addition, petitioner sued the Brickner law firm in 1983, at which time petitioner learned that Strathern had not always followed his instructions to consult Brickner about investments. The record does not disclose whether petitioner's investment in Western Reserve was a subject of either suit. In late 1982, petitioner engaged Abraham Krantz (Krantz) to provide accounting and bookkeeping services, and to prepare and file tax information. Krantz had been a California certified public accountant for at least one but less than three years. At the beginning of 1983, Krantz became involved with an IRS audit relating to petitioner's taxable years *375 1979 through 1981. The primary focus of the audit was petitioner's Sentinel investment, which was a commodity straddle of questionable economic substance that had been recommended to petitioner by Strathern. In the latter half of 1983, during the course of the audit, the IRS examining agent, Roger Strumm (Strumm), mentioned to Krantz that Western Reserve might be subject to an IRS examination. Krantz then reviewed the Western Reserve information in petitioner's possession, which included a private placement memorandum or prospectus, some correspondence from Western Reserve, a $ 60,000 canceled check dated in December of 1981, and a series of promissory notes, two of which were nonrecourse and short-term and two of which had terms of over 10 years. While conducting his review, Krantz did not determine what assets and liabilities Western Reserve had at the time. Krantz learned at about this time that some of petitioner's other investments, which Krantz believed Strathern had recommended to petitioner, had proved to be poor economic investments. Having decided that the Western Reserve investment was a "sham" and a "fraudulent-type situation," Krantz requested a meeting with petitioner, *376 which was held toward the end of 1983, and they discussed Western Reserve. Krantz, aware that petitioner had filed a lawsuit against Strathern, informed petitioner of his belief that petitioner's Western Reserve investment had no economic value. Krantz also recommended that petitioner not claim a Western Reserve deduction for 1983. Petitioner earlier had suspected that his Western Reserve investment was a total economic loss when, in May or June of 1983, he received an IRS request for documentation pertaining to his Western Reserve investment. Petitioner claimed a Western Reserve loss deduction of approximately $ 242,000 on his 1982 tax return, as follows. At about the time Krantz was forming his opinion of Western Reserve, his office prepared petitioner's 1982 return. Although Krantz was aware of possible IRS examination interest in Western Reserve, he decided that the 1982 loss allocated to petitioner by Western Reserve, $ 241,561, should be deducted on petitioner's 1982 return. His reasons were that the Schedule K-1 for 1982 had been received, petitioner's December 1981 check had been cashed in 1982, and the ongoing IRS audit of petitioner's returns would ultimately make *377 any necessary adjustments. Petitioner had not instructed Krantz to determine the availability of this deduction, nor did he take part in Krantz's decision to claim the deduction for 1982. Petitioner (as the taxpayer) and Krantz (as the paid preparer) signed petitioner's 1982 Form 1040 on December 7, 1983. The IRS received the filed return on January 6, 1984. Krantz ceased performing professional services for petitioner early in 1984. Timothy Seagondollar (Seagondollar), a certified public accountant since May of 1981, became petitioner's accountant in August or September of 1984. Knowing that Seagondollar was to be the preparer of petitioner's 1983 return, Krantz met with him. At this meeting, Krantz recommended that no Western Reserve deduction be claimed for 1983 on the grounds that the partnership was under audit and, in Krantz's opinion, it lacked economic substance. Petitioner had received a pre-filing notification letter from the IRS, dated April 11, 1984, stating that Western Reserve deductions for taxable year 1983 would be disallowed. In preparing petitioner's 1983 return, Seagondollar followed the recommendation of Krantz, without any input from petitioner, and did *378 not claim a 1983 Western Reserve deduction. Included on the last page attached to the Ron Lapin Revocable Trust return for 1983 was the following: Notification to Secretary of Inconsistent Treatment of Partnership Item
Pursuant to IRC Sec. 6222 the Secretary is notified that the partner information issued to the Taxpayer by Western Reserve Oil and Gas * * * has not been applied to this return. At such time in the future that the Audit of the partnership by the IRS is completed and the information can be relied upon, the Taxpayer will file an Amended Return.
Either before or after preparing petitioner's 1983 return, but before the end of 1984, Seagondollar reviewed the documentation on Western Reserve that petitioner kept in his office and concluded that Western Reserve was a "complete sham." Seagondollar also determined at that time that petitioner's Western Reserve investment was worthless. Sometime after determining the sham nature of Western Reserve, Seagondollar computed what petitioner's 1982 tax liability would be without the Western Reserve deduction. Seagondollar was aware that section 6661, with its then 10-percent rate, was potentially applicable as a technical matter. *379 Relative to the size of the Western Reserve deduction and other adjustments, however, he did not consider the potential section 6661 liability important. Seagondollar met with IRS agent Strumm many times while representing petitioner and discussed with Strumm the decision not to take a Western Reserve deduction for 1983. The two also had some discussion about the availability and timing of a deduction for petitioner's out-of-pocket cash investment in Western Reserve. Seagondollar did not claim an out-of-pocket deduction for petitioner for 1983 in part because he was under the impression that Strumm would ultimately allow such a deduction for 1981. In late 1984, Strumm informed Seagondollar that Western Reserve was under audit and that a major adjustment would be forthcoming. Strumm also mentioned that the Western Reserve promoters were being investigated both civilly and criminally. In December of 1986, Seagondollar, as petitioner's authorized representative, executed a Form 872-A consenting to an extension of the period within which respondent could assess income taxes relating to petitioner's taxable year 1982. Seagondollar executed a similar form, in November of 1987, for *380 petitioner's taxable year 1983. Seagondollar had not yet been advised that the IRS intended to impose a section 6661 addition to tax and he did not mention section 6661 in advising petitioner about whether to extend the assessment periods. In June of 1988, IRS appeals officer Mara Hodgkins (Hodgkins) mailed Seagondollar a settlement offer, the terms of which did not include a reference to section 6661. Sometime prior to September 29, 1988, however, Hodgkins discussed with Seagondollar the possible determination of a section 6661 addition to tax. Respondent mailed the notice of deficiency applicable to this case on March 1, 1989. During 1983, the IRS identified Western Reserve as a potential abusive tax shelter. Revenue agent Bobbie Tadlock (Tadlock) was assigned to examine the Western Reserve partnership return for its 1981 taxable year in about April of 1983. In October of 1983, which was sometime after he picked up the 1982 taxable year, Tadlock contacted IRS District Counsel attorney Steven New (New) about the examination. New was formally assigned to the investigation by the end of November. After reviewing the Western Reserve prospectus sent to him by Tadlock, New told *381 Tadlock in mid-December 1983 that he thought the following were probably applicable to Western Reserve, in accordance with Rev. Proc. 83-78, 1983-2 C.B. 595: a promoter penalty, injunctive relief, and pre-filing notification letters to investors. By letters dated December 19, 1983, the IRS informed the Western Reserve promoters of these possible actions. Sometime in January 1984, the promoters' representatives met with the IRS representatives. By the end of March 1984, the IRS had decided that it would send pre-filing notification letters advising Western Reserve investors that their purported tax benefits would not be allowable. The IRS mailed such a letter to petitioner on April 11, 1984. During 1983 petitioner took no action to notify Western Reserve that he was abandoning his partnership interest, nor has he ever attempted to pursue legal action against Western Reserve or its promoters. Petitioner has not received a distribution from Western Reserve since 1983. OPINION Petitioner invested $ 60,000 in Western Reserve in 1981. After claiming a $ 241,561 Western Reserve deduction for 1982, petitioner filed a 1983 return that did not claim a Western Reserve deduction. Petitioner *382 concedes that he is not entitled to the Western Reserve deduction he claimed for 1982, but now argues that he is entitled to a 1983 theft loss deduction or abandonment loss deduction under section 165 for his unrecovered cash outlay. Petitioner also disputes respondent's determination of a section 6661 addition to tax for 1982. Theft Loss Deduction
Section 165(a) generally allows as a deduction any loss "sustained" during the taxable year if "not compensated for by insurance or otherwise." Included among these losses for individuals are losses of property from theft. Sec. 165(c)(3) and (e). Whether the taxpayer has sustained a theft loss is determined generally under the law of the jurisdiction in which the loss was sustained. Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956); Luman v. Commissioner, 79 T.C. 846, 860 (1982).Petitioner bears the burden of proof. Viehweg v. Commissioner, 90 T.C. 1248, 1253 (1988); Rule 142(a). Petitioner argues that in 1983 he discovered the theft loss of the $ 60,000 cash he invested in Western Reserve. Petitioner invokes both Federal law (mail fraud) and California law in asserting the existence and nature of the alleged theft. Respondent *383 disputes petitioner's contention that there was a theft as defined by the applicable law and, even assuming a theft, disagrees that petitioner discovered a theft loss in 1983. We find it unnecessary to decide whether petitioner was the victim of a theft under either Federal or State law. Assuming, without deciding, that he was, petitioner has failed to establish that he discovered his loss in 1983 or that, in 1983, he did not have a reasonable prospect of recovery of the loss. On these grounds, the deduction must be disallowed. Section 165(e) provides that "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." A loss is considered to be discovered when a reasonable person in similar circumstances would have realized that he or she had suffered an unrecoverable loss. Cramer v. Commissioner, 55 T.C. 1125, 1134 (1971).Although a theft loss must be considered as sustained in the year of its discovery, section 165(e) does not indicate that discovery of some false representation (even amounting to theft under applicable law) creates a theft loss as of the date of the discovery of the falsity of the representation. *384 The statute "refers to the year of discovery of the loss, not of the theft." Rainbow Inn, Inc. v. Commissioner, 433 F.2d 640, 642 (3d Cir. 1970), revg. a Memorandum Opinion of this Court; see Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 808 (1974), affd. 521 F.2d 786 (4th Cir. 1975).This means that more must be shown than the discovery of a theft. The taxpayer must show the discovery of a "loss" for which "it can be ascertained with reasonable certainty whether or not * * * reimbursement will be received." Sec. 1.165-1(d)(3), Income Tax Regs.; see Alison v. United States, 344 U.S. 167, 170 (1952). The vague and imprecise evidence on this point is not convincing. Petitioner testified that he discovered Western Reserve was a sham in May or June of 1983. He based the sham conclusion not on any reasoned or factual analysis of his legal rights or the recoverability of his alleged loss, but primarily upon the fact that the IRS had made a request for "more documentation." [3] Despite his alleged "May or June" determination, petitioner signed his 1982 return months later, on December 7, 1983, and thereon claimed a Western Reserve deduction of some $ 242,000. The record is not clear *385 concerning when in 1983 petitioner and Krantz met to discuss Western Reserve. We infer that the meeting took place probably before December 7, 1983, but almost certainly before the 1982 return (received by the IRS on January 6, 1984) was sent on to the IRS. Thus, even if petitioner were viewed as reaching his sham conclusion at the meeting with Krantz, rather than during May or June of 1983, he still would have filed a 1982 return that was inconsistent with and postdated that conclusion. We also note that petitioner did not claim a Western Reserve theft loss deduction on his 1983 return, which return corresponds to the year of the alleged theft loss discovery. This omission suggests that there was no such discovery during that year. McKinley v. Commissioner, 34 T.C. 59, 63-64 (1960). Krantz testified that he determined in late 1983 that Western Reserve was a sham, based on an examination of the Western *386 Reserve prospectus and other information in petitioner's files. Yet he prepared petitioner's 1982 return on which the $ 242,000 deduction was claimed. He permitted that return to be filed either in 1984 or so late in 1983 that the return was not received by the IRS until after the close of the year. Moreover, Krantz admitted that he made no analysis of Western Reserve's financial condition (its assets and liabilities) at the end of 1983 or, we infer, at any other time during the year. Nor is there any evidence that he made any study, or reached any conclusions, with respect to petitioner's recourse rights against Western Reserve itself, its principals, or Strathern. As we view Krantz's testimony, his primary concern was whether petitioner should claim the Western Reserve deduction of $ 242,000 on his 1982 return. Krantz knew that if the deduction was not claimed, petitioner would not get the benefit of the $ 242,000 loss shown on his Western Reserve Schedule K-1. Evidence that the IRS would challenge the Western Reserve loss deduction or that it would ultimately be disallowed does not constitute evidence of the discovery of a loss within the meaning of section 165(e). The existence *387 of the alleged loss here depends not on the allowability of a tax deduction but on whether petitioner discovered that he had been fraudulently induced to make the Western Reserve investment and, if so, whether petitioner had a reasonable prospect of recovery from Western Reserve, from any of its principals or promoters, or from Strathern. Rainbow Inn, Inc. v. Commissioner, supra at 642-643; Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. a Memorandum Opinion of this Court. Petitioner has not shown that he discovered in 1983 that he had suffered a theft loss with respect to his Western Reserve investment. Although a loss is generally deductible in the year "sustained," sec. 165(a), to be considered sustained a loss must be evidenced by a closed and completed transaction. Sec. 1.165-1(d)(1), Income Tax Regs.; Boehm v. Commissioner, 326 U.S. 287, 291 (1945); Dawn v. Commissioner, supra at 1078.A transaction is not closed under this doctrine if, in the year of the alleged loss, the taxpayer has a claim for reimbursement that provides a reasonable prospect of recovery. Ramsay Scarlett & Co. v. Commissioner, supra.
As explained in section 1.165-1(d)(2)(i), Income Tax Regs., *388 which is made expressly applicable to thefts by section 1.165-8(a)(2), Income Tax Regs.: If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. * * *
Except for Strathern, petitioner does not make entirely clear who the alleged wrongdoers are in this case. Nonetheless, we can infer from his arguments that they include the Western Reserve promoters and perhaps the Western Reserve general partners. Petitioner pursued only Strathern through litigation. Petitioner testified that he commenced a legal action against Strathern "I believe at the end of '82 or '83," with allegations of "fraud, mismanagement, and not wanting to *389 release documents." Petitioner did not testify about the relief he sought. Because of petitioner's uncertainty about when the litigation commenced and his vague testimony regarding the allegations, we cannot be certain whether petitioner's causes of action related specifically to the alleged theft at issue here. We note, however, that petitioner's allegations of theft are based largely on fraud. The record does not disclose when or how the lawsuit against Strathern was resolved. The filing of a lawsuit gives rise to an inference that the taxpayer has a claim for reimbursement that provides a reasonable prospect of recovery. Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959); Dawn v. Commissioner, supra at 1078; Gale v. Commissioner, 41 T.C. 269, 276 (1963); see Marine v. Commissioner, 92 T.C. 958, 980 (1989).Although his lawsuit may not have related specifically to the present theft allegations, petitioner did not make such a showing, and we would be justified in drawing a contrary conclusion. Regardless, the filing of the lawsuit supports an inference that petitioner believed Strathern would be able to respond to a judgment for a loss incurred as a result *390 of Strathern's alleged theft. Estate of Scofield v. Commissioner, supra at 159. As already noted, petitioner filed no lawsuits against the Western Reserve promoters or general partners. When asked at trial, by counsel for petitioner, why he had not sued the promoters, petitioner testified that he did not know who they were. Petitioner added: "And how much would it cost me to sue on a $ 60,000 investment?" Although petitioner testified that he did not know who the promoters were, he may have in effect been testifying that he did not know what " promoters" are. Trevor Phillips (Phillips) was heavily involved with Western Reserve, in several capacities, from its inception through the years here in issue. See Ferrell v. Commissioner, 90 T.C. 1154 (1988).The record suggests that petitioner actually knew of Phillips and could readily learn about other Western Reserve principals if so inclined. Specifically, Phillips' involvement in the venture, along with names and involvement of other principals, is apparent from the prospectus petitioner had in his office. Further, petitioner had earlier testified that Strathern, in recommending the Western Reserve investment to petitioner, spoke *391 of Phillips by name as experienced in the oil and gas business. Accordingly, we will not infer from petitioner's testimony that he was foreclosed from litigation by a lack of essential information about potential defendants. We are also unconvinced by petitioner's implication that a $ 60,000 lawsuit is not worth pursuing because of the associated litigation costs. This may sometimes be the case, but there are obviously many considerations other than the amount of the claim that enter into the typical decision to pursue or forgo legal action. Among these considerations is the prospect of recovery. Petitioner has presented no evidence on the prospect of recovery from either his subjective viewpoint or the viewpoint of an objective reasonable person. Notably absent is any evidence about the financial condition of potential defendants and their respective abilities to satisfy a monetary judgment. As this Court has stated: Losses, to be deductible under the revenue laws, must be actual, realized losses, and in any case where there is a reasonable ground for reimbursement the taxpayer must seek his redress and may not secure a loss deduction until he establishes that no recovery may *392 be had. "It is a startling proposition that a taxpayer may, for reasons of his own, decline to enforce a valid claim against a responsible concern and then assert that he has sustained a business loss which the Government should share." [Whitney v. Commissioner, 13 T.C. 897, 901 (1949).Citation omitted.]
We cannot infer from petitioner's inaction toward the Western Reserve principals that there was no reasonable prospect of recovery. The absence of a pending legal action during the year of an alleged theft loss does not necessarily mean that there was no such prospect. Dawn v. Commissioner, supra at 1078; Viehweg v. Commissioner, 90 T.C. 1248, 1253, 1255-1256 (1988); see Ramsay Scarlett & Co. v. Commissioner, 61 T.C. at 811-812.Here, in failing to show any interest in pursuing the alleged wrongdoers at Western Reserve, petitioner has failed to establish that he sustained a theft loss in 1983. See Miller v. Commissioner, 733 F.2d 399, 402-403 & n.8 (6th Cir. 1984), affg. a Memorandum Opinion of this Court; Hills v. Commissioner, 691 F.2d 997, 1001 (11th Cir. 1982), affg. 76 T.C. 484 (1981). Petitioner on brief makes two principal arguments, one of which is procedural, that the *393 "claim for reimbursement" doctrine does not preclude a 1983 theft loss deduction. As a procedural matter, petitioner argues that respondent did not assert the existence of a claim for reimbursement in his answer, in his trial memorandum, or at trial, and thus the issue is not properly before the Court. We need not consider the case in which neither party raises the claim for reimbursement issue prior to post-trial briefs. That case is not before us because petitioner here raised the issue at trial. During his direct examination of petitioner, counsel for petitioner asked, "Have you brought any actions against Mr. Strathern?" and later asked, "Why didn't you sue the promoters of the Western Reserve?" Petitioner's answers to these questions raised inferences about possible claims for reimbursement, some of which inferences we have already discussed. Petitioner may not avoid unfavorable inferences drawn from his own testimony on direct examination. Cf. Rule 41(b)(1) (issue not raised by pleadings treated as if it had been, if tried by express or implied consent of parties). Under these circumstances, petitioner was neither surprised nor prejudiced. Further, as discussed above, *394 the absence of a reasonable prospect of recovery is an essential element of the loss concept as used in section 165. United States v. Rexach, 482 F.2d 10, 29-31 (1st Cir. 1973). Petitioner's second argument concerning possible claims for reimbursement is that, as a matter of law, petitioner is barred from any such claim. Petitioner cites Ferrell v. Commissioner, supra at 1180, as evidence for the unknown whereabouts of one of the Western Reserve promoters and a Canadian residence for the other. According to petitioner, California law requires that an action for fraud be brought within three years of the discovery of the fraud. Petitioner thus suggests that the applicable statute of limitations has run for any possible claims against Phillips and Terry Mabile. Similarly, with regard to Strathern, petitioner argues that California law requires a commenced legal action to be tried within five years. Over five years have passed since petitioner filed his lawsuit against Strathern in 1982 or 1983. The simple and dispositive answer to this line of argument is that these current circumstances have no applicability to the year at issue, 1983. "The standard is to be applied by foresight, *395 and hence, we do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year." Ramsay Scarlett & Co. v. Commissioner, 61 T.C. at 811.See also Rainbow Inn, Inc. v. Commissioner, 433 F.2d at 644.
Abandonment Loss Deduction
As an alternative to his theft loss position, petitioner argues that he is entitled to a section 165 abandonment loss for 1983. In that year, asserts petitioner, he abandoned a worthless investment in Western Reserve that had originally resulted from a transaction entered into for profit under section 165(c)(2). We find that petitioner has failed to establish his entitlement to an abandonment loss deduction for 1983. As with theft losses, a deductible abandonment loss must be evidenced by closed and completed transactions and fixed by identifiable events occurring during the year of the loss. Sec. 1.165-1(d)(1), Income Tax Regs.; Gulf Oil Corp. v. Commissioner, 87 T.C. 135, 156 (1986).In order for a loss to be sustained and to be deductible, there must be an intention to abandon the asset and an affirmative act of abandonment. A.J. Industries, Inc. v. United States, 503 F.2d 660, 670-671 (9th Cir. 1974); *396 Middleton v. Commissioner, 77 T.C. 310, 322 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982). Other than self-serving, conclusory testimony that he did indeed abandon his investment in 1983, petitioner has provided no meaningful evidence of an act of abandonment. Instead, what evidence there is indicates that petitioner did not abandon the investment. He admittedly took no action during 1983 to notify Western Reserve or anyone else that he was abandoning his partnership interest. Moreover, in response to a question about how he abandoned his investment, petitioner testified in effect that there was no such act: I think it worked both ways. I think there was nothing -- it abandoned me and I abandoned it. I mean, I never got any returns from it; there were no dividends; there was nothing and I consider it totally gone, if it was ever something to begin with.
Petitioner suggests that, because he ceased claiming Western Reserve deductions beginning with his taxable year 1983, this serves as an act of abandonment. We are not persuaded, in part because petitioner's 1983 return was not filed until 1984. What occurred in 1983 was that petitioner signed his 1982 return, containing *397 a substantial Western Reserve deduction, on December 7, 1983. Further, despite petitioner's disclaimer relating to the 1983 tax benefits, the Ron Lapin Revocable Trust was still a partner on the books of Western Reserve and thereby eligible to share in any economic benefits, however remote those chances might have been. Finally, petitioner's statement on his 1983 return that he was not claiming a Western Reserve deduction was hardly a statement of finality: "At such time in the future that the Audit of the partnership by the IRS is completed and the information can be relied upon, the Taxpayer will file an Amended Return." We are also troubled by petitioner's position concerning the worthlessness of his investment during the year in issue. Both of petitioner's post-Strathern accountants, Krantz and Seagondollar, decided that the investment was economically worthless and Krantz even made his determination during the subject year, 1983. However, Krantz admittedly made his determination without knowledge of the then-present assets and liabilities of Western Reserve. Coupling this with the remainder of the Krantz testimony about his review of Western Reserve promotional and organizational *398 materials suggests that the investment, at least in Krantz's mind, was worthless from the outset and did not become so in 1983. In these circumstances, the right to a deduction for a 1983 abandonment loss has not been established. Section 6661 Substantial Understatement
Section 6661(a) provides that if there is a substantial understatement of income tax for any taxable year, then 25 percent of the amount attributable to such understatement shall be added to the tax. Petitioner makes two arguments in opposition to the section 6661 addition to tax for 1982. Petitioner first seeks a reduction in the rate from the 25 percent determined by respondent to 10 percent. Because the 25 percent rate was not incorporated into section 6661 until 1986 and represents a 150-percent increase over the pre-1986 rate, petitioner maintains that the use of 25 percent for petitioner's 1982 taxable year is constitutionally impermissible as a violation of due process. Congress changed the section 6661(a) rate to 25 percent in section 8002(a) of the Omnibus Budget Reconciliation Act of 1986 (OBRA), Pub. L. 99-509, 100 Stat. 1874, 1951. See Pallottini v. Commissioner, 90 T.C. 498 (1988), in which this Court *399 resolved conflicting statutes relating to this rate. OBRA was signed into law on October 21, 1986, and the amendment to section 6661(a) applies to "penalties assessed after the date of the enactment of this Act." OBRA, Pub. L. 99-509, sec. 8002(b), 100 Stat. 1951. Congress may constitutionally enact tax statutes with retroactive application if it determines that the old tax rate must be modified to achieve a more equitable and efficient distribution of the burden of taxation. Welch v. Henry, 305 U.S. 134 (1938); Cooper v. United States, 280 U.S. 409, 411-412 (1930); Brushaber v. Union Pacific R. Co., 240 U.S. 1, 20 (1916); DeMartino v. Commissioner, 88 T.C. 583, 587 (1987), affd. 862 F.2d 400 (2d Cir. 1988), affd. without published opinion sub nom. Appeal of McDonnell, 862 F.2d 308 (3d Cir. 1988), affd. without published opinion sub nom. McDonnell v. Commissioner, 862 F.2d 308 (3d Cir. 1988).The retroactivity of a revenue statute is suspect if it involves a new tax, but not if it involves a mere change in rate or a technical amendment. Buttke v. Commissioner, 625 F.2d 202, 203 (8th Cir. 1980), affg. 72 T.C. 677 (1979); Picchione v. Commissioner, 440 F.2d 170, 173 (1st Cir. 1971), *400 affg. 54 T.C. 1490 (1970); Howell v. Commissioner, 77 T.C. 916, 921 (1981); see United States v. Darusmont, 449 U.S. 292, 299-300 (1981).Congress increased the section 6661(a) rate to 25 percent to raise revenue, to deter noncompliance, and to compensate the Government for the cost of enforcing the tax laws. Staff of Joint Comm. on Taxation, Description of Tax Penalties, at 20-25 (J. Comm. Print 1988); cf. S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 182-183. Application of the 25-percent rate is rationally related to a legitimate governmental purpose and does not violate petitioner's constitutional due process rights. [4]
Petitioner's second argument relating to section 6661 is that respondent abused his discretion by not waiving the addition to tax in accordance with section 6661(c): "The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith." This Court has stated with respect to section 6661(c): The administrator's *401 judgment and ability to provide uniform treatment to similarly situated taxpayers deserves our deference. We should not substitute our judgment for his. Nevertheless, we should not refrain from judging whether his discretion has been exercised arbitrarily, capriciously, or without sound basis in fact. The standard of review most appropriate in the case of failure to grant a waiver is, therefore, whether respondent abused his discretion. [Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988).Citations omitted.]
Petitioner lists several factors that allegedly demonstrate respondent's abuse of discretion. First, petitioner argues that the purposes of section 6661 were met (i.e., respondent was apprised of a questionable deduction) because Strumm knew about the Western Reserve issue before petitioner filed his 1982 return and because Krantz told Strumm that petitioner would claim the deduction for 1982. Petitioner also notes that Krantz, not petitioner, made the decision to claim the deduction. Furthermore, argues petitioner, IRS appeals officer Hodgkins did not mention section 6661 in proposing a settlement in her June 1988 letter, nor had Seagondollar and the IRS discussed section *402 6661 prior to Seagondollar's consenting to extend the assessment period in December of 1986. Finally, petitioner maintains that he never disputed the allowability of the 1982 Western Reserve deduction once it was questioned by the IRS and that both petitioner and Krantz made every effort to assess petitioner's proper tax liability under the law. We note initially that the record does not support petitioner's contention that Krantz informed Strumm of his intention to claim the 1982 deduction. True, counsel for petitioner asked Krantz at trial if he discussed the filing of the 1982 return with an IRS representative and Krantz replied affirmatively. Krantz's subsequent statement that "we decided * * * that we would take it for 1982 and there would be some further adjustment in the audit" might imply a joint decision with Strumm, but in our view "we" is more reasonably read in context as not referring to Strumm or any other IRS representative. Indeed, an exchange only three questions earlier went as follows: Q. Did you determine for 1982 that the Western Reserve deduction should be reflected in the 1982 return? A. At that time, our call was to reflect it because we had received a *403 K-1 and our return was prepared reasonably into -- in the year * * *. [Emphasis added.] Even if Krantz did inform Strumm of the dedction, petitioner's 1982 taxable year was not yet a subject of Strumm's examination because petitioner had not filed his 1982 return. Regarding when the IRS first raised the section 6661 issue, Seagondollar repeatedly testified that the first mention of the section was in the notice of deficiency mailed on March 1, 1989. However, when confronted at trial with a letter he wrote to Hodgkins dated September 29, 1988, which letter referred to section 6661, Seagondollar admitted that there apparently had been some discussion earlier then he recalled. The record thus shows that Seagondollar had the opportunity to request a waiver well before issuance of the notice of deficiency. Nonetheless, because Seagondollar cannot remember even having discussed section 6661 at the administrative level, petitioner has not shown that a waiver was ever requested. We are reluctant to find that respondent abused his discretion here when, for all the record establishes, he was not requested to exercise it. Seagondollar also testified that the imposition of the section 6661 *404 addition to tax would have affected his advice to petitioner concerning the consent to extend the assessment period. This testimony implies a prejudice to petitioner that arguably warrants a waiver of the addition to tax. Seagondollar, however, was aware of section 6661, and its potential technical application to petitioner, before signing a Form 872-A in December of 1986 that had no restrictions or conditions relating to section 6661. In addition, OBRA, the act that amended the rate in section 6661(a) to 25 percent, had been signed into law well over a month before Seagondollar executed the Form 872-A. The most important factor in determining reasonable cause and good faith under section 6661(c) is the extent of the taxpayer's effort to assess the proper tax liability under the law. Sec. 1.6661-6(b), Income Tax Regs.; Mailman v. Commissioner, supra at 1084.Krantz did expend some effort in analyzing petitioner's Western Reserve investment prior to his preparation of petitioner's 1982 return. The precise sequence of events is not clear from the record, but apparently Krantz determined that Western Reserve was a sham at about the time that he prepared and signed the 1982 return. *405 Looking back from the time of trial, Krantz believed that he should not have taken the 1982 Western Reserve deduction. Nonetheless, Krantz did claim the deduction for petitioner on petitioner's 1982 return, for reasons largely unrelated to his view of the proper tax liability for that year. Under these circumstances, with Krantz preparing a return that was inconsistent with his own strongly held view that the Western Reserve deduction was not allowable, we cannot find that petitioner showed he satisfied this "most important factor" of section 6661(c). There is no suggestion that Krantz misled petitioner. Indeed, as noted above, petitioner testified that he decided Western Reserve was a sham in May or June of 1983, more than six months before his 1982 return was filed. Respondent does not abuse his discretion by ignoring allegedly diligent efforts to assess the proper tax liability if the taxpayer, in filing the associated return, ignores the unequivocal conclusions derived from those efforts. This principle is no less applicable merely because the taxpayer later chooses to acquiesce when the IRS challenges the questionable deduction. We also do not believe that petitioner's reliance *406 on Krantz's professional advice is inconsistent with a section 6661 addition to tax. Reliance on professional advice does not constitute a showing of reasonable cause and good faith unless, under all the circumstances, such reliance was reasonable. Sec. 1.6661-6(b), Income Tax Regs. Because of his meeting with Krantz in late 1983, petitioner was well aware of the Western Reserve tax problem and understood Krantz to recommend that petitioner not claim a Western Reserve deduction for 1983. Prior to authorizing the filing of his 1982 return, petitioner reasonably should have inquired of Krantz about the Western Reserve deduction therein, which was four times the amount of his out-of-pocket economic loss. In our view, petitioner's reliance on Krantz in this instance has not been shown to be reasonable and does not support a waiver of the addition to tax. We hold that respondent did not abuse his discretion in declining to waive the section 6661 addition to tax, in whole or in part, for 1982. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on the deficiency.↩
2. The relevant returns for each of 1982 and 1983 are petitioner's individual return (Form 1040) and the Ron Lapin Revocable Trust fiduciary return (Form 1041). For the issues before us, there is generally no need to distinguish the two types of returns for a given year. Therefore, a reference to "1982 return" or "1983 return" in the singular includes both returns for that year.↩
3. Petitioner's testimony also suggests that a discussion with his accountant, Krantz, affected his determination in May or June of 1983. However, Krantz testified that he first reviewed the Western Reserve investment in the "second half of '83" and "the third and fourth quarter of '83."↩
4. See Licari v. Commissioner, T.C. Memo. 1990-4; see also Karpa v. Commissioner, T.C. Memo. 1989-535↩.