EDNA MCCULLOUGH, ET AL., [1] Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent McCullough v. Commissioner
Docket Nos. 23294-87, 23340-87, 23585-87, 23592-87
United States Tax Court
T.C. Memo 1990-653; 1990 Tax Ct. Memo LEXIS 728; 60 T.C.M. (CCH) 1514; T.C.M. (RIA) 90653; December 31, 1990, Filed *728 Decisions will be entered under Rule 155. Between 1979 and 1986 petitioners invested funds in (1) a double trust scheme promoted by Frank Forrester, and (2) Mexican pagares (notes) purchased through a Mexican investment counsellor, Laura Antillon. Petitioners did not recover all the funds they invested and on amended returns for the years 1982 through 1987, filed on Jan. 25, 1989, after these cases were scheduled for trial, they claimed deductions for theft losses arising out of those transactions for the year 1985, which produced net operating losses for 1985 which they carried back to the years 1982 through 1984. Respondent denied the losses for 1985 and the carrybacks to the years 1982 through 1984. Held: Petitioners failed to carry their burden of proof that they were entitled to theft losses in 1985 or 1986. Net operating loss carrybacks to the years 1982 through 1984 denied. Towner Leeper, for the petitioners. Phillip A. Pillar, for the respondent. DRENNEN, Judge. DRENNEN
*2167 MEMORANDUM FINDINGS OF FACT AND OPINION By separate notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to Tax, Sec. [2]
Year
Deficiency
6651(a)(1)
6653(a)
6653(a)(1)
6653(a)(2)
Edna McCullough
(Docket #23294-87)
1983
$ 3,391.00
$    0    $    **   $   169.00
$  * 1984
3,626.50
0    **   181.00
* Leon McCullough
(Docket #23340-87)
1983
11,936.50
0    **   597.00
* 1984
12,531.81
3,133.00
**   627.00
* Edna McCullough
(Docket #23585-87)
1980
7,735.40
0    387.00
**  **
1981
9,002.00
0    **   450.00
* 1982
6,400.00
0    **   320.00
* Leon McCullough
(Docket #23592-87)
1980
22,768.57
5,692.14
1,138.00
**  **
1981
26,860.28
6,715.00
**   1,343.00
* 1982
19,644.07
4,911.00
**   982.00
* *732 Year
Deficiency
6654
6661
Edna McCullough
(Docket #23294-87)
1983
$ 3,391.00
$   0   $    0   1984
3,626.50
0   0   Leon McCullough
(Docket #23340-87)
1983
11,936.50
0   2,984.00
1984
12,531.81
$ 780.00
3,133.00
Edna McCullough
(Docket #23585-87)
1980
7,735.40
0   0   1981
9,002.00
0   0   1982
6,400.00
0   1,600.00
Leon McCullough
(Docket #23592-87)
1980
22,768.57
0   0   1981
26,860.28
2,058.00
0   1982
19,644.07
1,931.00
4,911.00
In his answer, respondent asserted that petitioners are also liable for increased interest pursuant to section 6621(c). After concessions, the remaining issues for decision are (1) *733 whether petitioners sustained theft losses during the taxable year 1985 for which they are entitled to deduct a net operating loss carryback to the taxable years 1982 through 1984; (2) whether petitioner Edna McCullough is liable for additions to tax pursuant to sections 6653(a), 6653(a)(1), 6653(a)(2), and 6661, and increased interest pursuant to 6621(c); and (3) whether petitioner Leon McCullough is liable for additions to tax pursuant to sections 6651(a)(1), 6653(a), 6653(a)(1), 6653(a)(2), 6654, and 6661, and increased interest pursuant to section 6621(c). It is appropriate at this juncture to dispose of a procedural matter pending before this Court. At trial, respondent objected to the admissibility of petitioners' Exhibits 36, 48, 50, 58, and 59 on grounds of irrelevancy. We took respondent's objections under advisement. Upon due consideration we find that these exhibits have a tendency to make the existence of facts that are of consequence to the determination of these consolidated cases more or less likely than without them. See Federal Rules of Evidence 401 and 402. Therefore, respondent's objections to the admissibility of petitioners' Exhibits 36, 48, 50, *2168 58, and *734 59 are overruled and these exhibits are received into evidence. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Edna and Leon McCullough, resided in Silver City, New Mexico, at the time their petitions herein were filed. During the years in issue, Leon McCullough was engaged in the practice of chiropractic medicine, and Edna McCullough was self-employed as a beautician. [3] Unless otherwise indicated, "petitioner" where used herein will refer to Leon and "petitioners" will refer to both Leon and Edna. Petitioners filed four separate petitions on July 13, 1987, for a redetermination of the taxes determined by respondent in his four notices of deficiency, all dated April 14, 1987. The cases *735 were all consolidated for trial. Edna timely filed separate Federal income tax returns for the taxable years 1980 through 1984. On these returns she reported income and deductions from the beauty shop she operated which resulted in little or no taxable income for any of those years. Leon filed individual Federal income tax returns for the years 1980 and 1983, the 1983 return being timely filed. On these returns he reported no taxable income. He failed to file returns for the years 1981, 1982, and 1984; substitute returns for those years were prepared for him by respondent's examining agent. In the four notices of deficiency, dated April 14, 1987, respondent determined, inter alia, that Leon had various amounts of taxable income in the form of interest, pensions and net profits in each of those years, and that Edna received various amounts of taxable income in each of those years which she had not reported. In the four petitions filed herein petitioners alleged as the facts upon which they relied as the basis for their cases, that: (a) On the advice of one Frank Forrester, petitioner transferred assets to a foreign trust in order to avoid paying income taxes. Petitioner *736 was not engaged in any trade or business relative to the foreign trust nor did the petitioner enter into the transaction for purposes of making a profit. (b) Petitioner is not taxable on the income realized by the foreign trust. (c) Alternative, petitioner was swindled by this investment and is entitled to a deduction for petitioners' cost in the property transfer. In a stipulation filed when these cases were called for trial, petitioners conceded that each of them is taxable on the income determined by respondent in the notices of deficiency, subject to the reduction of the taxable income of Leon by one-half of the amount of such taxable income due to the effect of New Mexico community property law. In his answers, in support of his claim for increased deficiencies, respondent alleged that during the years at issue petitioners purported to transfer various interests in petitioners' property to a trust, petitioners failed to include in their taxable income amounts which were instead attributed to the trust, and petitioners' use of the so-called constitutional trust is a sham or fraudulent transaction within the meaning of section 6621(c)(3)(A). On January 25, 1989, after *737 this case was scheduled for trial, petitioners each filed amended returns for 1982 through 1987, each claiming theft loss deductions in connection with their double trusts and Mexican investment transactions in the respective amounts of $ 87,059.22 and $ 58,500.00 for the year 1985 or 1986. These deductions formed the basis upon which petitioners claimed net operating loss deductions which they carried back to 1982 through 1984 and forward to years not before the Court. At the trial of this case, respondent's agent assigned to examining petitioners' amended returns, Herlinda Benavidez, testified that although she had not yet completed her audit of petitioners' Forms 1040X, none of petitioners' claims for theft loss deductions were allowable. [4]
*738 Respondent agreed in the stipulation to permit petitioners the benefit of income averaging *2169 as to each of the taxable years 1980 through 1984, as applicable. Respondent agreed to credit petitioners with the following payments made with respect to the trust scheme: Date
Amount 07/03/81
$  2,560.15
03/05/82
6,222.88
03/15/81
5,857.00
02/11/83
1,738.00
03/04/84
2,374.22
04/04/85
2,028.94
02/24/87
1,894.50
Total
$ 22,675.99
"Double Trust" Program
Petitioner participated in a tax avoidance scheme known as the "double trust." Under the double trust program, participants sold their "life services" under personal service contracts for one dollar per year to Professional and Technical Services (PTS). The double trust marketing manual (the manual), promoted PTS as "an off-shore Panamanian trust, which has no tax liability of its own, and once legal transfer has been made to it irrevocably, henceforth all assets and all earnings thereon are tax-free and outside the jurisdiction of the IRS." Participants became purported agents of PTS and, as its agents, were required to transfer their paychecks to PTS. According to the *739 manual, the payments for personal services (i.e., the participant's paychecks and other earned income) constitute accounts receivable "which can be resold to third parties. If the payment has been resold before constructive receipt has been realized, then the tax liability is legally transferred to the third party buyer." After a participant transferred a paycheck to PTS, it was understood that PTS would return between 90 to 92 percent of the amount of the paycheck to the participant in the form of "gifts." The manual stated that the "gifts" were "100% tax free and nonreportable." Petitioner requested information regarding the double trust program and received the manual in response thereto. Attached to the manual was a transmittal letter on American Dynamics Corporation (ADC) stationery, dated November 15, 1980, and signed by Frank Forrester (Forrester). ADC acted as the bookkeeper for PTS and another entity known as International Dynamics Incorporated (IDI). (Frank Forrester, ADC, IDI, and PTS are hereinafter collectively referred to as the double trust entities.) Petitioner began participating in the double trust program after receiving the double trust promotional materials. *740 In this regard, petitioner, as settlor, established the McCullough Constitutional Trust to which he transferred monies and quitclaimed properties. Petitioner, as trustee, drafted checks drawn on the McCullough Constitutional Trust checking account that were made payable to IDI. In a letter, dated May 18, 1985, petitioner was advised that: Frank Forrester will be unavailable for an indefinite period of time and no further business can be conducted by or thru [sic] this office until his return. Therefore, we can no longer accept checks of any kind for any purpose whatsoever until further notice. * * * In a letter to IDI, dated February 28, 1986, petitioner stated that ADC's post office box had been closed. Petitioner also requested IDI's assistance in processing tax forms and certain checks. In an undated letter from Mrs. Frank Forrester that petitioner received sometime during 1986, petitioner was informed that Forrester had died in jail while serving a two-year sentence for contempt of court. Petitioner was also informed that: As a result of Frank's conviction on the contempt charge all company records and documents relating to clients and company matters *741 were seized by the IRS and the FBI. * * * As the situation here develops and hopefully eventually resolves itself we will be in contact with you by mail as we receive more information. * * * Moreover, with this letter, Mrs. Forrester returned seven checks totalling $ 33,268.69. The seven checks, dated December 23, 1985 through December 30, 1985, were drafted by petitioner, as trustee of the McCullough Constitutional Trust, and payable to IDI. Petitioner sent a letter dated September 1, 1986, to the American Arbitration Association, wherein petitioner enclosed a confirmation statement from ADC, in addition to Mrs. Forrester's letter. In his letter to the American Arbitration Association, petitioner also made inquiry as to how he could "recover these funds." It is stipulated that petitioners "invested" a total of $ 190,511.23 through the trust scheme into an entity known as American Dynamics Corporation. Petitioners' counsel, Henry R. Quintero (Quintero), instituted a lawsuit against Forrester's estate, et al., on January 14, 1988, to recover monies invested in the trust scheme. The evidence introduced in this case suggests that the predominant motive behind filing *742 the lawsuit was to toll the period of limitations (three years on such a claim under the laws of New Mexico). Petitioners' evidence indicates that monies transferred to the double trust entities have not been recovered by petitioners. *2170 Mexican Investment
Petitioners purportedly transferred a total of $ 187,000 to Laura Antillon (Antillon), an investment broker located in Mexico. Antillon invested the monies, on behalf of petitioners, in Mexican promissory notes known as "pagares." Over the years, starting prior to 1980, petitioner received correspondence from Antillon acknowledging monies received, confirming investment transactions, relaying information regarding the various peso devaluations vis-a-vis the dollar, and requesting loan repayment extensions. One such letter, dated February 15, 1980, acknowledged receipt of 26 checks drawn on petitioner's account, totalling $ 117,000, and confirmation that petitioner's funds would be forwarded to a Mexican corporation known as Inmobiliaria y Constructoria Lomas del Sol, S.A. (Lomas), in exchange for a three-year interest-bearing pagare. A transmittal letter from Lomas to petitioner, dated March 17, 1980, accompanied a pagare, *743 No. 401, issued by Lomas, the principal amount of which was $ 117,000 due and payable to petitioners on February 14, 1983. Lomas subsequently replaced pagare No. 401, payable in U.S. dollars, with a new pagare, B-907, payable in Mexican pesos (reissued at an exchange rate of 77.84 pesos per dollar with an apparent maturity date of February 14, 1986). According to Lomas, the reissuance was "required by law." In a letter dated May 3, 1985, Antillon informed petitioner that she attended a meeting with representatives of Lomas during which Lomas proposed to "make to all investors * * * the payment of 39.33% of the debt in property (land) and the remaining 60.67% in stock[.] Also, in substitution of the monthly interest or interest at maturity an additional amount in shares." Petitioner apparently rejected this proposal in a letter to Antillon dated August 19, 1985. In a letter addressed to Lomas, dated July 23, 1985, petitioner demanded payment on two other overdue pagares, but made no mention of either pagare No. 401 or pagare B-907. Milos Halvacek, an investor in Mexican pagares, contacted petitioner and other investors regarding the possibility of retaining Mexican counsel *744 in order to recover amounts invested in pagares. In a letter, dated July 19, 1985, Halvacek informed petitioner that the peso exchange rate, vis-a-vis the dollar, ranged between 377 and 385 at the cambios (foreign currency exchange houses). On the basis of past dealings with Mexican counsel, Halvacek recommended retaining a certain Mexican law firm. Petitioner agreed to Halvacek's suggestion and, on November 5, 1985, executed a general power for collection and suits in the Mexican law firm's favor. Petitioner Edna McCullough was unaware as to whether any lawsuit has ever been filed or judgment obtained with respect to the Lomas pagare investment. OPINION The issue for decision is whether petitioners are entitled to a deduction for a net operating loss carryback from 1985 to taxable years 1982 through 1984, or from 1986 to 1983 and 1984. [5] Resolution of this issue is dependent upon whether petitioners sustained theft losses within the meaning of section 165(c) during the taxable year 1985. *745 Petitioners contend that during 1985 they sustained theft losses arising from their participation in the double trust program promoted by Forrester and from their Mexican pagare investments, and that by the end of 1985 it was clear that there did not exist a reasonable prospect of recovering on any claim for reimbursement on these theft losses. Respondent asserts that not only did a reasonable right of recovery exist at the end of taxable year 1985, but that the losses claimed by petitioners were not the result of thefts. Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(c) provides that: In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) * * * losses of property not connected with a trade or business or a transaction entered into for profit, if such *746 losses arise * * * from theft. While the parties devote most of their attention in their briefs to the year in which the claimed losses occurred, we think we must first determine whether the events and circumstances which form the basis of petitioners' claimed losses qualify as "thefts." Since petitioners have in their petition disavowed that they were engaged in any trade or business relative to the foreign trusts established on the advice of Forrester and that they did not enter into these transactions for purposes of making a profit, the only basis for their claim for loss *2171 deductions under section 165, with respect to the Forrester transactions, is that the losses were from "theft." While the petition avers in the alternative that "petitioner was swindled by this investment and is entitled to a deduction for petitioners cost in the property transfer," they point to no provision in the law which allows a deduction for "swindle" per se, so we will assume for purposes of this discussion that the two words "theft" and "swindle" are used interchangeably. Whether a loss from theft *747 has occurred depends on the law of the jurisdiction where it was sustained. Edwards v. Bromberg, 232 F.2d 107 (5th Cir. 1956); Montelone v. Commissioner, 34 T.C. 688, 692 (1960). Unlike the circumstances in a case recently decided by this Court, Kreiner v. Commissioner, T.C. Memo. 1990-587, wherein it was held that losses sustained in connection with fortune-telling qualified as theft losses because under New York law the crime of fortune-telling constitutes the crime of theft, we find nothing in the law of either New Mexico or Mexico that would specifically classify the actions of either Forrester in the double trust scheme or the Mexican investment counselor in the pagares investment scheme as a theft. The New Mexico Criminal Code does not specifically make "theft" a crime. It does define "fraud" as the intentional misappropriation or taking of anything of value which belongs to another by means of fraudulent conduct, practices or representations. N.M. Stat. Ann. section 30-16-6 (Supp. 1988). The elements of such criminal fraud include *748 proof of intent to defraud the victim by false pretenses at the time of taking and reliance upon those misrepresentations by the victim. State v. Ferguson, 56 N.M. 398, 244 P.2d 783 (1952); State v. Gregg, 83 N.M. 397, 492 P.2d 1260 (Ct. App. 1972), cert. denied 83 N.M. 562, 494 P.2d 975 (1972). No evidence was presented that proved that Forrester used either false pretenses or misrepresentations to induce petitioners to invest in his scheme. In fact, petitioners got what they bargained for. Forrester did not return all of their investment to them but this alone does not constitute fraud or misrepresentation. See Marine v. Commissioner, 92 T.C. 958, 978-979 (1989); Viehweg v. Commissioner, 90 T.C. 1248, 1254-1255 (1988). We cannot tell from the record just how petitioners lost their money in the Mexican pagare transactions but we have no evidence that it was by virtue of misrepresentations. The record does not show who got the money or how. We doubt that either scheme would qualify as "theft" under New Mexico law. At least, we have not been shown that they did. We must therefore attempt to *749 determine whether those actions would qualify as thefts within the meaning of that word as used in section 165(c)(3). Section 1.165-1(b), Income Tax Regs., provides that: To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and section 1.165-11, relating to disaster losses, actually sustained during the taxable year. * * * Section 1.165-8(d), Income Tax Regs., defines "theft" as including, but not necessarily limited to, larceny, embezzlement, and robbery. In Viehweg v. Commissioner, supra at 1254-1255, this Court said: The record simply does not contain evidence of theft. There is no evidence establishing that any statements or representations that Foreman may have relied on were false; there is no evidence establishing that any false statements were made with the intent of criminally appropriating Foreman's money; and there is no evidence establishing *750 that Foreman's loss was related to any false representations. * * * neither report indicates that petitioners were the victims of a swindle. [Fn. ref. omitted]. A similar analysis of the facts in this case, such as we have, leads to the same conclusion with respect to the investment in the double trust scheme in this case. Petitioner heard about the double trust scheme and he contacted Forrester to participate in it. It is stipulated that petitioners had no trade orbusiness relative to the trust scheme, nor did they enter into the scheme with the objective of making a profit, but rather to avoid income taxes. There is no evidence that Forrester or anyone else misled or deceived petitioner. Under Forrester's instructions petitioners established their own "foreign" trust and contributed funds to it over a period of years until Mrs. Forrester returned checks to them explaining that Mr. Forrester was in jail and could no longer receive checks. This was in 1985; but between December 23 and December 30, 1985, petitioners nevertheless sent more than $ 33,000 to an investment company established by Forrester. These checks were returned to petitioners in 1986 by Mrs. *751 Forrester. The parties stipulated that from 1981 through 1985 petitioners invested a total of $ 190,511.23 in an investment vehicle marketed by a Forrester corporation. The record does not establish how these funds were used or what they were used for, nor does it establish that petitioners made an effort to recover these funds until after Forrester's *2172 death in 1986, when they brought suit against Forrester's estate. According to Mrs. McCullough's testimony, when these transactions began, petitioners either turned their paychecks over or gave money to one of Forrester's corporations and they immediately received a check from the trust for 90 percent of the amount paid out. Later the repayments did not arrive, but there was nothing in their contract that provided for repayment. They bargained for and received tax advice, even though it was not good advice. They knew what they were doing; Forrester did not mislead them nor did he take their money under false pretenses. There is no evidence that they were swindled by Forrester. There is no evidence that their money was stolen by Forrester. While Forrester's actions may have been reprehensible, that does not support a claim of *752 theft, which is the misappropriation of another's property without the owner's consent. Petitioners voluntarily transferred their property to Forrester. They may have expected to get some of it back, but what was to be returned to them was classified by the parties involved as a gift because no consideration was given for it. In our opinion petitioners have failed to establish that the "trust" funds were stolen from them without their consent. They have not proven that the loss they may have suffered in connection with their investment in the foreign trusts qualified as a theft loss within the meaning of section 165. See West v. Commissioner, 88 T.C. 152 (1987). Section 165(e) provides that "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Section 1.165-1(d)(3), Income Tax Regs., provides, in relevant part, that: However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion *753 of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received. A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). The existence of a reasonable prospect of recovery at the end of the taxable year in which a theft loss is claimed will preclude a deduction in that year because a deductible loss must be evidenced by a closed or completed transaction. Boehm v. Commissioner, 326 U.S. 287, 291 (1945); Ramsay Scarlett & Co. v. Commissioner, supra at 807. But the reasonableness of the prospect as it existed at the close of the taxable year for which the deduction is claimed "is not to be viewed through the eyes of the incorrigible optimist." Ramsay Scarlett & Co. v. Commissioner, supra at 811. *754 In other words, we must determine whether a loss has been sustained in fact during 1985. Boehm v. Commissioner, supra at 292-293. Such a determination must result from an objective inquiry into the facts and circumstances surrounding the claim. Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. a Memorandum Opinion of this Court. This objective standard is to be applied by foresight and we refrain from examining "facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year." Ramsay Scarlett & Co. v. Commissioner, supra at 811. Moreover, although a taxpayer's attitude and conduct should not be ignored, they are not the controlling or sole criterion to be used in making the determination. Boehm v. Commissioner, supra at 293. Neither the objective facts nor petitioner's conduct indicate that petitioner discovered the alleged theft or embezzlement of the monies in 1985. *755 Theft or embezzlement losses cannot be claimed prior to the year in which they are discovered. Asphalt Industries, Inc. v. Commissioner, 411 F.2d 13 (3d Cir. 1969), affg. a Memorandum Opinion of this Court. Petitioners proffered attorney Quintero's testimony regarding the lawsuit that he filed against Forrester's estate in 1988. Quintero regarded the claim as "a shot in the dark." Petitioners assert that Quintero's characterization of the claim tends to prove that at the end of 1985 petitioners had no reasonable prospect of recovering the monies sent to the double trust entities. But petitioners instituted a suit against Forrester and his corporations in 1988 to recover these monies and judgment was entered in petitioners' favor. Quintero's characterization neither bolsters nor otherwise supports petitioners' claim of a theft loss deduction for 1985. See Ramsay Scarlett & Co. v. Commissioner , supra at 812. When petitioner received the unsigned letter from ADA, dated May 18, 1985, he was informed that his check was being returned. He was further advised that Forrester was unavailable for an indefinite period of time and that no checks *756 could be accepted or business conducted through that office. Thereafter, petitioner wrote seven checks, totalling $ 33,268.69, payable to *2173 IDI. The seven checks were dated December 1985. Although the letter of May 18, 1985, should have aroused petitioner's suspicion that something was awry, petitioner's act of drafting seven checks, dated December 1985, is inconsistent with the probability that petitioner harbored such a suspicion. Even when petitioner wrote the letter to IDI, dated February 28, 1986, he merely acknowledged that ADC's post office box "is closed" and requested that IDI process petitioner's checks totalling $ 33,268.69. The checks were apparently returned by Mrs. Forrester in an undated letter sent to petitioners during 1986. There is also nothing in the record to indicate that petitioners had prior knowledge of the events revealed in Mrs. Forrester's letter of 1986. Moreover, the record before us reveals that it was not until September 1986, when petitioner sent a letter to the American Arbitration Association, that petitioner took the first affirmative step towards recovering the monies sent to the double trust entities. From the record it is clear that petitioners *757 did not discover the double trust entities' embezzlements by the end of the taxable year 1985. However, if petitioners discovered a theft loss with respect to the "double trust" investment in 1985, as they claim, they have failed to prove that they had no reasonable prospect of recovery in 1985 or 1986. Petitioners filed a suit against Forrester and others to recover their investment in 1988. They obtained a judgment in that suit. There is no evidence that they tried but were unable to collect on the judgment. Furthermore, there is evidence that petitioners' attorney continued to search for assets of Forrester's estate in 1987. These activities do not suggest that petitioners believed they had no reasonable prospect for recovery in either 1985 or 1986. Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959), revg. on this issue 25 T.C. 774 (1956); Ramsay Scarlett & Co., Inc. v. Commissioner, supra . Nor are petitioners entitled to a theft loss deduction in taxable year 1985 for their Mexican pagare investment. When Lomas substituted pagare B-907, payable in pesos, for pagare No. 401, payable in dollars, *758 the substitution changed the nature of petitioners' investment and undoubtedly increased its risk. However, based on the record before us, it is unclear as to whether during 1985 petitioners sustained a loss, much less a theft loss, as a result of Lomas' issuing pagare B-907. The record is not clear on just what these transactions were. In 1979 petitioner was approached by two Mexicans who inquired whether he was interested in investments in Mexico. Petitioner told them he was. The plan was that petitioner was to contact an investment broker in Mexico who would give him advice and invest his money for him, presumably the profit would arise from either purchasing the notes at a discount or having the notes sold or redeemed at a profit. Petitioner apparently started turning money over to Antillon, a Mexican investment broker, for investment in 1979 and 1980. For awhile he received profits from these transactions. Then petitioners' pagares were unilaterally revised to be payable in Mexican pesos, which lost value rather quickly. Upon being advised that the exchange of dollar notes for peso notes was required by law, petitioner made the exchange, at considerable loss. Upon being *759 advised that the Mexican law did not require the exchange of dollars for pesos, petitioner objected. In 1985 petitioner, on the advice of a friend, employed a Mexican law firm to bring suit against the obligors on the pagares to recover the face value of the pagares in U.S. dollars. He paid the law firm a retainer but could get no action from the lawyers. These investments had apparently been relatively dormant for three or four years before petitioner employed the lawyers. When the lawyers took no action in 1985 neither of petitioners did anything about it, nor have they since. There is no satisfactory explanation in the record why petitioners did not pursue their effort to collect their investment. There is no evidence that petitioners were misled, cheated, or swindled in these transactions, nor that anyone stole their money. There is no satisfactory proof that petitioners' losses in the Mexican investments qualified as theft losses under section 165(c)(3). See Williams v. Commissioner, T.C. Memo. 1985-201. There is a suggestion in the record that petitioners might have collected something on their pagares had they pursued it in 1985, but there is no suggestion *760 of why they did not. Edna McCullough testified that she was unaware as to whether any lawsuit has ever been filed or judgment obtained with respect to the pagare investment. Nor have petitioners otherwise presented any cogent facts bearing on the likelihood of reimbursement as it existed at the close of 1985 or 1986. Petitioners have failed to prove that at the end of 1985 they had no reasonable prospect of recovering their Mexican pagare investment. There is no evidence whether the pagares are still in existence or whether the maker thereof has any funds. There is nothing in the record to prove that anything happened in 1985 or 1986 that increased or decreased petitioners' prospect of reimbursement of the monies transferred to their Mexican pagare investment. The only evidence presented indicates that petitioners employed Mexican attorneys to file suit to *2174 recover their investment in 1985. However, according to Edna McCullough's testimony, petitioners are unaware whether any lawsuit has ever been filed or judgment obtained with respect to the Lomas' pagare investment. If a suit was filed there is no evidence of what the status or result of the lawsuit is. Nor have petitioners *761 presented any cogent facts bearing on the likelihood of reimbursement as it existed at the close of the taxable year 1986. Hence, the losses cannot be regarded as closed and completed transactions in 1985 or 1986 and they are not deductible in those years whether they qualify as theft losses or not. We have, at all relevant times, given proper consideration to the state of petitioner's mental and physical condition, but petitioners did not seek a continuance of this case on those grounds. Based on the facts and circumstances in the record before us, we find that petitioners have failed to prove that anything occurred during either 1985 or 1986 that increased or decreased petitioners' prospect of recovering claims for reimbursement of monies transferred either to the double trust entities or on their Mexican pagare investment. Hence, the losses cannot be regarded as closed and completed transactions in those years, and are, therefore, not deductible in those years. Without the deduction of those losses petitioners have failed to prove that they had operating or theft losses in 1985 or 1986 that could be carried back to any of the years before us to offset the taxable income respondent *762 determined for those years, which petitioners stipulated to be correct. Additions to Tax
Petitioners have stipulated that they failed to report amounts properly includable on each of their Federal income tax returns for taxable years 1980 through 1984. We also find that petitioner failed to file Federal income tax returns for taxable years 1981, 1982, and 1984 and failed to timely file his 1980 Federal income tax return. In his notices of deficiency, respondent determined additions to tax under sections 6651(a)(1), 6653(a), 6653(a)(1), 6653(a)(2), 6654, and 6661. Petitioners bear the burden of proof with respect to these additions to tax. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Section 6651(a)(1)
Respondent determined that petitioner is liable for additions to tax under section 6651(a)(1) for failure to timely file Federal income tax returns. Petitioner contends that his failure to timely file was due to reasonable cause and not due to willful neglect. Petitioner seeks to establish reasonable cause by asserting that his involvement in the *763 Forrester scheme caused him to sincerely believe that he did not have to file tax returns. Assuming petitioner's assertion amounts to reasonable cause, which it does not, petitioner's position is inconsistent with his concession that amounts transferred to the double trust entities were properly taxable to him. Furthermore, there is no evidence that petitioners made any reasonable inquiry as to the tax consequences of investing in a double trust. Because petitioner has not shown that his failure to timely file Federal income tax returns for the taxable years 1980, 1981, 1982, and 1984 was due to reasonable cause and not due to willful neglect, respondent's determinations under section 6651(a)(1) are sustained. Sections 6653(a), 6653(a)(1) and 6653(a)(2)
Respondent also determined that petitioners' failure to report income was attributable to negligence or intentional disregard of rules or regulations and, therefore, petitioners are liable for additions to tax under sections 6653(a), 6653(a)(1) and 6653(a)(2). Negligence, within the meaning of section 6653(a), has been defined as *764 the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners' filing status for Federal income tax purposes was married filing separate returns. Petitioners resided in New Mexico, a community property State. In a community property State, the income of each spouse is community income and one-half is therefore attributable to the other spouse and must be reported on the other spouse's separate return. United States v. Malcolm, 282 U.S. 792 (1931); Galliher v. Commissioner, 62 T.C. 760, 762, (1974), affd. without opinion 512 F.2d 1404 (5th Cir. 1975), cert. denied 423 U.S. 988 (1975). Petitioner Edna McCullough failed to report community property income earned by her husband, Leon, during the years in question. She testified that, because her husband was the principal investment-decision maker for the couple, her failure to report the income at issue was due to her reliance on his decisions. However, because *765 separate returns were filed and in light of the settled principles of the community property system, petitioner Edna McCullough must shoulder the responsibility for reporting and paying Federal income taxes on her portion of the community income. United States v. Mitchell, 403 U.S. 190, 205-206 (1971); Galliher v. Commissioner, supra at 764; see also section 6013(e)(1)(A). Moreover, regarding the additions to petitioner's taxes, this Court has previously held that failure to timely file income tax returns is sufficient evidence of negligence. Emmons v. Commissioner, *2175 92 T.C. 342, 347 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Petitioners have not met their burden of proving that their failure to report the income was not attributable to negligence or intentional disregard of rules or regulations. Respondent's determinations under sections 6653(a), 6653(a)(1) and 6653(a)(2) are sustained. Section 6654
Respondent also determined that petitioner is liable for the additions to tax under section 6654 for the *766 taxable years 1981, 1982, and 1984 for failure to make estimated income tax payments. There is nothing in the record to indicate that petitioner made estimated income tax payments toward his conceded tax liabilities or that petitioner filed any estimated income tax returns. Therefore, the section 6654 addition to tax is mandatory unless petitioner can place himself within one of the exceptions to section 6654. Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). Petitioner has failed to do so. Respondent is sustained on this issue. Section 6661
We now turn our attention to the issue of whether petitioners are liable for the additions to tax under section 6661 which attach, at a rate of 25 percent, to substantial understatements of income tax. See Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). Respondent determined that petitioner substantially understated his Federal income tax liability for the taxable years 1982 through 1984 and that Edna McCullough substantially understated her Federal income tax liability for 1982. *767 For purposes of section 6661, a substantial understatement is an understatement of tax on a return that exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. We find that petitioners substantially understated their Federal income tax liabilities within the meaning of section 6661. Respondent's determinations under section 6661 are sustained. Increased Interest
Finally, we address the issue of whether petitioners are liable for increased interest under section 6621(c). Since the claim for increased interest was first asserted by respondent in his answer, he bears the burden of proving by a preponderance of the evidence that there exists a substantial understatement of tax attributable to a tax-motivated transaction. Rule 142(a). Section 6621(c)(1) provides that "In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax-motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment *768 rate established under this subsection." For purposes of section 6621, a tax-motivated transaction includes any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(v). Petitioners have stipulated that they participated in the "double trust" for "the purpose of the avoidance of payment of income taxes. This trust scheme was a sham." We agree. Moreover, for purposes of section 6621(c), a substantial underpayment exists where the amount of the underpayment of taxes attributable to the tax-motivated transaction exceeds $ 1,000. Petitioners have stipulated that each of them is taxable on proportionate amounts attributable to their involvement in the "double trust." The underpayment of tax attributable thereto exceeds $ 1,000. Therefore, to the extent section 6621(c) is applicable to the years before us, we find that respondent has met his burden of proving that there existed a substantial underpayment of tax attributable to tax-motivated transactions within the meaning of section 6621(c). Respondent is sustained on this issue. Because of concessions, Decisions will be entered under *769 Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Leon McCullough, docket No. 23340-87; Edna McCullough, docket No. 23585-87; and Leon McCullough, docket No. 23592-87. These cases were consolidated for purposes of trial, briefing, and opinion by order dated August 10, 1988.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
**. Not applicable↩
*. To be determined ↩
3. At the beginning of the trial the Court was advised that Leon McCullough's mental and physical condition was deteriorating, as a result of which he would be unable to testify at the trial.↩
4. It is not clear from the record in this case whether respondent made a determination disallowing the theft loss and swindling losses which petitioners claimed were incurred in 1985 and 1986. Petitioners did not claim these losses in their original returns and the notices of deficiency issued for the years 1982 through 1984 made no determination with respect to them. The losses were claimed on amended returns filed by petitioners in 1989, after the case was placed on a trial calendar. Respondent did not accept the amended returns. However, the loss issues were raised in the petitions filed by petitioners and were denied in respondent's answer. In a notice of objection to petitioners' motion for a continuance of the trial, respondent agreed that if respondent was unable to complete his audit of petitioners' amended returns, and if petitioners did not accept the results of respondent's examination, petitioners could offer proof at trial of their loss and deduction. At the trial both parties offered evidence with respect to the losses and both parties briefed that issue. Hence we consider the claimed losses to be at issue in this case.↩
5. We believe the claim on brief for a carryback of a loss from 1986 was an afterthought. Even the amended returns for 1982 through 1984, submitted in 1989, claimed carrybacks from 1985 only. We do not believe events occurred in 1986 which made the claimed losses any more deductible in 1986 than they were in 1985.↩