WAYNE R. VIEHWEG AND MARY JANE VIEHWEG, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29646-81, 28211-82, 13397-84, 284-85, 36285-85, 41882-86.

Filed June 23, 1988.

*Bruce I. Hochman, James V. Looby,* and *Dennis L. Perez,* for the petitioners.
*Stephen M. Miller,* for the respondent.

OPINION

COHEN, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Viehweg | 29646-81 | 1977 | $39,038.78 |
| | | 1978 | 30,418.00 |
| Morfit | 28211-82 | 1975 | 135,015.54 |
| | | 1976 | 54,270.99 |
| | | 1977 | 92,383.95 |
| | | 1978 | 51,773.18 |
| Finneran | 13397-84 | 1976 | 32,411.00 |
| | | 1977 | 63,648.00 |
| | | 1978 | 49,359.00 |

---

[1]Cases of the following petitioners are consolidated herewith: Thomas Garrison Morfit and Thomas Garrison Morfit and Kathleen J. Morfit, docket No. 28211-82; James M. Finneran and Jo Anne Finneran, docket No. 13397-84; Robert J. Foreman and Elizabeth H. Foreman, docket No. 284-85; T. B. Hudson and Dorothy Hudson, docket No. 36285-85; and Kurt D. Nauta and Leslie J. Nauta, docket No. 41882-86.

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Foreman | 284-85 | 1977 | $23,182.61 |
| | | 1978 | 25,027.08 |
| Hudson | 36285-85 | 1977 | 53,559.00 |
| | | 1978 | 29,611.00 |
| Nauta | 41882-86 | 1972 | 890.21 |
| | | 1975 | 20,075.00 |
| | | 1976 | 18,415.57 |
| | | 1977 | 34,263.77 |

After concessions, the sole issue for decision is whether petitioners are entitled to theft loss deductions for out-of-pocket payments to various limited partnerships.

## Facts

All of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners Viehweg, Morfit, Finneran, and Nauta resided in Utah, South Carolina, Wisconsin, and California, respectively, when their petitions were filed. Petitioners Foreman and Hudson resided in Texas when their petitions were filed. The parties agree that our resolution of the issue presented for decision shall be based on stipulated facts and exhibits concerning the case of petitioners Robert J. Foreman (Foreman) and Elizabeth Foreman.

In 1975 and 1976, petitioners purchased limited partnership interests in I*Carb, I*Screen, and TRD, Ltd. Hal Rachal (Rachal), Foreman's attorney and investment advisor, provided Foreman with the I*Carb private placement memorandum (offering memorandum) in 1975. The offering memorandum stated that I*Carb would engage in the business of buying, selling, and trading in commodities and commodities futures. Substantially all of the offering memorandum's 18 pages were devoted to a discussion of the risks involved in commodities trading and the expected tax consequences of the partnership's activities. In 1975, I*Carb, I*Screen, and TRD, Ltd. engaged in "cash and carry" transactions identical to and controlled by the Court's opinion in *Julien v. Commissioner*, 82 T.C. 492 (1984). In 1976 and 1977, the partnerships also engaged in London options transactions identical to and controlled by

the Court's opinion in *Glass v. Commissioner*, 87 T.C. 1087 (1986), currently on appeal.

The offering memorandum received by Foreman set forth a plan wherein the partnership's investment in commodities would finance the development of a new carburetor. I*Carb, in its initial transaction, would agree to purchase from Inventive Industries, Inc. (Inventive), certain rights that would allow I*Carb to borrow, on a nonrecourse basis from institutional lenders, 100 percent of the cost of acquiring commodities. Inventive would agree to loan to I*Carb, on a nonrecourse basis, two-thirds of the interest, insurance, and other expenses to be incurred by I*Carb in connection with acquiring commodities; the balance of such expenses would be paid for with the capital contributed by I*Carb limited partners. The following would then take place:

(a) During 1976, I*Carb would contribute its commodities (subject to I*Carb's commitment to deliver these commodities in 1976 and subject to I*Carb's institutional indebtedness) to a corporation (NewCo) of which the stock would be owned totally by I*Carb;

(b) Inventive would form I*Carb, Inc., a subsidiary, to develop a new carburetor device;

(c) Inventive would then acquire the stock of NewCo through I*Carb, Inc., in exchange for a royalty of $3 for each carburetor device sold by I*Carb, Inc.;

(d) The royalties would commence during the first year in which at least 10,000 carburetors were sold and continue for 7 calendar years thereafter;

(e) I*Carb would then agree to use one-third of each royalty payment received from I*Carb, Inc., to satisfy I*Carb's indebtedness to Inventive; and

(f) NewCo would use the proceeds of the commodities to be acquired from I*Carb to retire the indebtedness due to institutional lenders.

The offering memorandum stated that:

I*Carb, Inc. will be a wholly owned subsidiary of * * * [Inventive], with exclusive rights to market the Device, a carburetor which may be used to replace both carburetors and air filters presently in use. Based on tests performed by * * * [Inventive], it is believed that the Device can increase gasoline mileage by more than 50% while meeting emission standards in effect for 1975, without using a catalytic converter or

unleaded gasoline. * * * [Inventive] will file patent applications, and will exclusively license I*Carb, Inc. to market the Device throughout the world.

The memorandum also warned, however:

The ability of I*Carb, Inc. to make royalty payments to the Partnership is dependent upon the ability of I*Carb, Inc. to successfully develop and market the Device. There can be no assurance that I*Carb, Inc. will be successful in its development and marketing efforts, or that the Device will prove sufficiently profitable to I*Carb, Inc. for the Device to remain in production.

In making his investment in I*Carb in 1975, Foreman relied totally on information provided by Rachal and the explanation of the transaction contained in the offering memorandum. Rachal had previously visited the I*Carb business premises and spent the day meeting with general partner Robert H. Richter (Richter), the inventor of the carburetor, and a salesperson. During this meeting, Rachal was provided with sales projections, shown the prototype carburetor, and given details of the marketing plan and projected income and profits from the sale of the carburetor. Rachal reported the details of this meeting to Foreman.

On May 12, 1977, the Securities and Exchange Commission brought an action (SEC action) against Inventive, I*Carb, Richter, and other individuals and entities related to Inventive. The defendants were alleged to have violated sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. secs. 773(a) and 773(c) (offer and sale of unregistered securities); section 10(b) of the Securities Act of 1934, 15 U.S.C. sec. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. sec. 240.10b-5 (1987) (fraud in connection with the purchase and sale of securities); and section 17(a) of the Securities Act of 1933, 15 U.S.C. sec. 77q(a) (fraud in the offer and sale of securities). On May 25, 1977, each of the defendants, "without admitting or denying any of the allegations," stipulated to the entry of a permanent injunction enjoining them from engaging in the future in the alleged statutory violations.

In connection with the SEC action, the U.S. District Court for the Southern District of Texas ordered the appointment of an independent director and receiver (independent director) to take charge of the affairs and assets of Inventive, its

subsidiaries and related partnerships, including I*Carb. On or around July 21, 1977, the independent director sent a letter to the investors and creditors of the defendants in the SEC action. The letter transmitted the independent director's first report, which discussed the financial condition of the defendants. Foreman received this letter and the independent director's first report.

The independent director determined that Inventive was a holding company organized by Richter in 1972. Richter was the controlling shareholder of Inventive, which, in turn, held 100 percent of the stock of its various subsidiary corporations. Richter was a president and director of Inventive and of each of its subsidiaries. In addition, Richter had organized a number of partnerships, including I*Carb, that had contractual ties with Inventive or its subsidiaries. According to the independent director's first report, it appeared that Richter had organized I*Carb and other partnerships to provide a method of raising tax-deductible equity capital for the consolidated operations of Inventive.

The independent director found that the records for Inventive and its related entities, including I*Carb, were incomplete, chaotic, and often nonexistent. The independent director also found that the funds flowing in and out of the various Inventive entities were almost totally commingled. The independent director doubted the ability of Inventive's current management to handle properly the business and financial aspects of the Inventive operations. The independent director determined that Inventive had an overwhelming amount of outstanding debt due, and he concluded that it was unlikely that funds sufficient to satisfy all outstanding creditor claims would be infused into Inventive in the near future.

On or around August 31, 1977, the independent director filed a second report in the SEC action. Foreman received a copy of this report. The second report summarized the events occurring from July 1, 1977, through August 31, 1977, and the business operations of Inventive and its affiliated partnerships.

In his second report, the independent director stated that Inventive did not engage in any business activities during the months of July and August 1977. The affiliated

partnerships, including I*Carb, were also inactive. No funds were raised and no income was received by the company or its affiliates. As of August 31, 1977, Inventive had not been successful in developing a viable plan to continue its operations and the operations of its affiliated partnerships. Thus, the independent director concluded that a liquidation of Inventive and its related entities and partnerships should be pursued.

On or around November 11, 1977, the newly appointed receiver and independent director, Robert M. Morris (Morris), filed his first report in the SEC action. Morris stated that there were no funds then available for continued operations of Inventive, any of its subsidiaries, or any of its partnerships. As of November 11, 1977, Morris had initiated steps to liquidate the properties of Inventive and its related entities and partnerships.

No lawsuits were brought by any of the petitioners with respect to the loss of their "investments" in I*Carb, I*Screen, or TRD, Ltd.

## Discussion

Petitioners concede that they are not entitled to deductions originally reported as losses from transactions identical to and controlled by the Court's opinions in *Julien v. Commissioner, supra,* and *Glass v. Commissioner, supra.* Instead, they now argue that they are entitled to theft loss deductions for their out-of-pocket "investments" in I*Carb, I*Screen, and TRD, Ltd.

Section 165[2] generally allows a taxpayer to deduct, in the year the theft is discovered, uninsured losses arising from the theft of property. Sec. 165(a), (c)(3), and (e). Whether a theft loss has been sustained within the meaning of section 165 is determined under applicable State law. *Luman v. Commissioner,* 79 T.C. 846, 860 (1982). Petitioners bear the burden of proof. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

The parties agree that Texas law governs whether a theft occurred. Petitioners rely on Texas Penal Code section 31.03, which defines "theft" as follows:

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue.

(a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owners of property.
(b) Appropriation of property is unlawful if:
(1) it is without the owner's effective consent;
[Tex. Penal Code Ann. sec. 31.03 (Vernon 1988 Supp.).]

Evidence of the fraudulent solicitation of funds is sufficient to demonstrate the requisite mental state for a theft conviction. *Pabst v. State,* 721 S.W.2d 438, 443 (Tex. App. 1986). A property owner's consent is not effective if induced by deception. Tex. Penal Code Ann. sec. 31.01(4)(A) (Vernon 1974); *Swope v. State,* 723 S.W. 216, 223 (Tex. App. 1986).

In *Paine v. Commissioner,* 63 T.C. 736 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975), the taxpayer relied on the predecessor to Texas Penal Code section 31.03 to claim a theft loss deduction. The taxpayer had purchased stock on the open market. The price of the stock had been artificially inflated because of the false representations of corporate officials. We observed:

> The initial difficulty petitioner confronts is that there is no evidence that the misrepresentations in question were made by the corporate officers with the specific intent of obtaining, acquiring, or securing any property or valuable right from petitioner and with the specific intent of criminally appropriating petitioner's property or right, or destroying petitioner's right to enjoyment. * * *
>
> Additionally, it is well settled that when a theft is accomplished through false representations, the false representations must have induced the injured party to part with his property. *Cleveland v. State,* 438 S.W. 2d 807 (Tex. Crim. App. 1969); *Womack v. State,* 408 S.W. 2d 119 (Tex. Crim. App. 1967); *Noblitt v. State,* 103 Tex. Crim. 550, 281 S.W. 849 (1926); *Whitley v. State,* 90 Tex. Crim. 503, 236 S.W. 470 (1922). Petitioner has not only failed to produce evidence that he relied on the misrepresentations, but has also failed to show that his loss was related to those misrepresentations. * * *
>
> [63 T.C. at 741-742.]

A similar analysis is appropriate here.

The record simply does not contain evidence of theft. There is no evidence establishing that any statements or representations that Foreman may have relied on were false; there is no evidence establishing that any false statements were made with the intent of criminally appropriating Foreman's money; and there is no evidence establishing that Foreman's loss was related to any false representa-

tions.[3] Although the reports of the first independent director state that records of Inventive and its affiliates were chaotic and disorganized, neither report indicates that petitioners were the victims of a swindle.

At most, the reports of the independent director suggest that petitioners were entangled in a business deal gone seriously wrong. Petitioners nevertheless received what they paid for. Our holdings in *Julien* and *Glass* were predicated on findings of tax motivation, and the record in this case is devoid of evidence suggesting that Foreman was motivated by anything other than expected tax benefits or that he did not get what he bargained to get. See *West v. Commissioner*, 88 T.C. 152, 161-164 (1987).

Petitioners' reliance on *Nichols v. Commissioner*, 43 T.C. 842 (1965), is thus misplaced. In *Nichols*, the taxpayers invested in a scheme that promised large income tax deductions to be derived from trading in Government bonds. The taxpayers bargained for a transaction in which there would be real purchases of bonds from which they could at least argue for their claimed tax benefits. Because no bonds were in fact purchased, we held that the taxpayers received only a "fake, counterfeit façade," and we concluded that the taxpayers were thus entitled to their claimed theft loss. 43 T.C. at 886. In this case, in contrast, the record contains no evidence establishing that any statements that may have been relied upon by Foreman regarding the carburetor were false. As for the partnerships' commodities activities, although petitioners maintain that "it is highly questionable that the commodities transactions were performed as represented," mere statements in briefs are not proof. Rule 143(b), Tax Court Rules of Practice and Procedure. Petitioners' equivocal assertion is, moreover, contrary to evidence in the record. *Nichols* does not support the result urged by petitioners.

Moreover, petitioners have failed to demonstrate that there was no reasonable prospect of recovering their "investments" in any of the years in issue. If in the year of the discovery of the loss there exists a claim for reimbursement with respect to which there is a reasonable prospect of

---

[3]The complaint filed by the Securities and Exchange Commission in the SEC action was not admitted into evidence for the truth of the matters contained therein.

recovery, then there is no closed and completed transaction fixed by identifiable events and thus no deductible loss. Secs. 1.165-8(a)(2) and 1.165-1(d), Income Tax Regs. Petitioners thus must have had no recourse or prospect of recovery in order to be entitled to a deduction. *Ramsey Scarlett & Co. v. Commissioner,* 61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975). The stipulated facts do not prove that petitioners could not have at least partially recovered their investments from partnership assets remaining after creditors had been satisfied, and petitioners have made no effort to demonstrate that they could not have recovered their funds from Richter personally.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*