ROLENE BUKOVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bukove v. Commissioner
Docket No. 28351-88
United States Tax Court
T.C. Memo 1991-76; 1991 Tax Ct. Memo LEXIS 91; 61 T.C.M. (CCH) 1974; T.C.M. (RIA) 91076; February 27, 1991, Filed *91 Decision will be entered under Rule 155. Jack Elon Hildreth, Jr., for the petitioner. Louis B. Jack and Sherri Spradley, for the respondent. NAMEROFF, Special Trial Judge. NAMEROFF
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended 1984 in the amount of $ 5,485, plus additions to tax of $ 856 under section 6651(a)(1), [1] $ 1,077 under section 6659, and $ 324 under section 6653(a)(1), plus 50 percent of the interest due on the entire underpayment under section 6653(a)(2). Respondent also determined that interest on the deficiency is to be computed under section 6621(c). In the event section 6659 were inapplicable, respondent determined an addition to tax under section 6661(a) in the amount of 25% of the underpayment. At trial, respondent orally moved for imposition of a penalty under section 6673. *92 After concessions, [2] the remaining issues to be decided are as follows: (1) Whether petitioner has established entitlement to an investment tax credit (ITC) carryforward in the amount of $ 3,847; (2) whether petitioner is entitled to a theft loss deduction, for any amount, in 1984; (3) whether petitioner is liable for an addition to tax provided by section 6651(a)(1); (4) whether petitioner is liable for additions to tax provided by section 6653(a)(1) and (2); (5) whether petitioner is liable for an addition to tax provided by section 6659, or in the alternative, whether petitioner is liable for an addition to tax provided by section 6661(a); (6) whether petitioner is liable for interest on a substantial underpayment attributable to tax motivated transactions pursuant to section 6621(c); and (7) whether petitioner is liable for a penalty under section 6673 for litigating frivolous issues. *93 Before setting forth the facts, we are constrained to comment on the state of the record in this case, the lack of cooperation between counsel, and the quality of the briefs filed in this case. Subsequent to the scheduling of this case for trial, respondent filed a motion to require petitioner to delineate the issues to be tried, as the petition takes a "shotgun approach" to issues. A pre-trial conference was held, and petitioner's counsel agreed to communicate with respondent as to issues and matters for stipulation. Nevertheless, the stipulation of facts consists of 21 paragraphs, some of which were hand-written, with numerous strikeovers, insertions and deletions, and obviously the result of a failure by the parties to cooperate at the early stages of trial preparation. The parties' separate lists of exhibits (with significant overlaps) were stipulated, but few of the nearly 100 exhibits were stipulated without various reserved objections for authenticity, hearsay, completeness, and/or "foundation." Indeed, numerous hearsay objections to listed exhibits were sustained by the Court during the trial. Inasmuch as the burden of proof of the issues in this case falls on petitioner, *94 the blame for these problems lies mostly with petitioner; respondent cannot be criticized when they were unaware of the specific issues to be tried until late in the pre-trial period. Petitioner's briefs fail to make reference to pages of the transcript, when appropriate, and often referred to exhibits not received in evidence. On the other hand, respondent's counsel never attempted to assist the Court in trying to straighten out the factual foundations, relying instead on petitioner's inability to prove the relevant facts. The result of the above is a jumbled mess of generalities. We have, therefore, attempted to piece together the factual narrative as best we can. FINDINGS OF FACT At the time of the filing of the petition herein, petitioner resided in Orange, California. Verdan and Rolene Bukove (hereinafter petitioner) filed a timely 1984 joint return, with the Fresno Service Center. Verdan Bukove died in 1987. No probate proceeding was ever initiated and no personal representative was ever appointed. [3]
*95 From at least 1971, Leslie Hawkey, Sr. (hereinafter Hawkey), owned and operated a tax preparation business known as "Hawkey Income Tax and Investments," located in Anaheim, California. This business was run with the help of Hawkey's son, Leslie Hawkey, Jr. (hereinafter "Biff"), who was an attorney, and Hawkey's two daughters, Ann Hawkey and Susan Hawkey-Bernbrock. In addition to preparing tax returns for their clients, Hawkey actively encouraged his clients to invest in various tax shelters. Hawkey, or his daughter Ann, were responsible for preparing the 1978 through 1983 tax returns of petitioner and her husband. In 1977, petitioner began investing in various investments promoted by Hawkey. Petitioner testified that both she and her husband trusted Hawkey completely. Accordingly, they relied exclusively on Hawkey's judgment in deciding where to invest their savings. During the years 1980 to 1983, petitioner paid $ 100,892 to Hawkey and/or his related entities. In 1980, petitioner invested $ 8,000 with Hawkey for an interest in an entity called the Red Mountain VII partnership. See Bukove v. Commissioner, T.C. Memo 1989-588. [4]
*96 In 1981, petitioner invested in entities entitled Castle Valley Mall (the Mall), and Hollow Bottle #4 and Hollow Bottle #5 (the Bottles). The Mall apparently was a real estate venture, and the land contract vendor foreclosed on the real property in 1985. The Bottles apparently consisted of entities which purportedly owned and leased a bar's inventory. In addition, petitioner invested in Hawkey entities called Dickinson Corner Pockets (Dickinson) in 1981 and North Dakota Leasing #2 (NDL) in 1982. The former seems to have been a billiard hall, while the latter owned the hall's fixtures and inventory. The only fact we are sure of is that Dickinson was a partnership, which for 1983 and 1984 was subject to the rules of section 6221 et seq. A partnership proceeding was closed without adjustment to partnership items for Dickinson for 1983. Petitioner invested $ 25,000 in Dickinson, located in Dickinson, North Dakota. Petitioner testified that she invested in Dickinson because Hawkey told her that she could earn more interest than she was getting at Home Savings Bank. In addition, petitioner was told that if she invested in Dickinson, she would pay less taxes and might receive a *97 refund. The only documentation that petitioner considered prior to such investment was a copy of the partnership agreement. Petitioner received monthly payments in the amount of $ 312.50 from Hawkey allegedly with regard to Dickinson, beginning in May, 1981, and continuing through May, 1985. Petitioner received the following amounts through 1984: 1981 - $ 2,500 (8 mos. at $ 312.50)
1982 - $ 3,750 (12 mos. at $ 312.50)
1983 - $ 3,750 (12 mos. at $ 312.50)
1984 - $ 3,750 (12 mos. at $ 312.50)
Total $ 13,750 Dickinson's returns [5] for 1981-1984 reflect the following: Year
Property eligible for ITC
1981
$ 4,193      (later amended to $ 1,795)
1982
$ 10,136     (later amended to $ 11,560)
1983
-0-         1984
$ 37,905     (A Form K-1 shows the Bukoves to have a 5%          interest and their share of the          property is $ 1,895)          *98 Petitioner invested $ 40,000 in NDL partnership, located in Bismarck, North Dakota. The partnership and leasing agreements for NDL were executed on April 1, 1982. Paragraph one of the lease agreement provided that the Hawkey Family Trust, [6] as lessee, agreed to lease from NDL, as lessor, certain personal property set forth in "schedule A." The Court notes that no "schedule A" was attached to the lease agreement received in evidence. Petitioner testified that she did not talk to any investment counselors, tax advisors, or visit the site before investing. Rather, petitioner was only shown pictures of the equipment by Hawkey. Hawkey told petitioner that NDL would pay her a return on her investment of 20 percent, or $ 666.66 per month, and that the interest payments would be tax free. Petitioner received monthly payments from NDL beginning in May, 1982, and continuing through September, 1984. Altogether, petitioner received the following *99 income from NDL: 1982 - $ 5,333.28 (8 mos. at $ 666.66)
1983 - $ 7,999.92 (12 mos. at $ 666.66)
1984 - $ 5,999.94 (9 mos. at $ 666.66)
Total $ 19,333.14 In 1984, petitioner may have also invested in a partnership called Sunchoke Z, apparently engaged in the farming of artichokes. Petitioner's 1981 joint return reflects losses from Castle Valley Mall of $ 15,833, Hollow Bottle #4 of $ 5,500 and Hollow Bottle #5 of $ 1,833. In addition an ITC of $ 911 was claimed, which either pertained to some mining investment not described in the record, or to the Bottles. In any event, the ITC was unused, as the tax liability prior to credits was shown as zero. The parties stipulated that petitioner and her husband were allowed losses from Hawkey-related investments for 1981 in the amount of $ 38,166. Petitioner's 1982 joint return reflects losses from the various Hawkey investments totalling $ 20,592 plus unused ITC computed at $ 4,067 (without regard to carryover), based upon assets of $ 40,666. The ownership of these assets was not identified. [7] Petitioner's 1983 joint return reflects losses only from Castle Valley Mall and the Bottles totalling $ 18,000. *100 Petitioner's 1984 joint return shows an ITC of $ 3,847 claimed as a carryforward from 1983, of which $ 3,589 was used to offset the reported tax liability. Although petitioner attached to the return Forms K-1 for various Hawkey entities (but not one for Dickinson) reflecting losses totalling $ 13,320, petitioner's return shows $ 6,430 in income with the following statement attached: "Taxpayers invested in a number of Hawkey Investment entities. The IRS has asserted these are abusive tax shelters, a complaint for fraud has been filed, and the FBI has seized records. As a result of an audit settlement, taxpayers have limited their losses to out-of-pocket expenses only on all Hawkey Investments. This results in $ 6,430 of income. The attached K-1's were not followed to the extent that losses exceeded out-of-pocket expenses." The source of the ITC's is not identified on the return. However, petitioner's attorney Jack Elon Hildreth Jr. (Hildreth), who prepared petitioner's 1984 return, represents that the ITC's were generated from NDL and Dickinson. The Court notes that the origin of the ITC's claimed on petitioner's 1984 return were never substantiated. On October 18, 1986, *101 petitioner signed a settlement agreement with revenue agent Sid Holstein (Holstein) for the years 1982 and 1983. Under the terms of that settlement, petitioner and her husband agreed to a complete disallowance of any tax benefits from their Hawkey investments in return for a deduction equal to 100 percent of their cash out-of-pocket. Holstein testified that, at the time he executed the Form 4549 (Income Tax Exam Changes), he crossed out a statement that a refund claim had been allowed in full, and specifically advised Hildreth that no ITC's from Hawkey investments were being allowed. The settlement resulted in no change to petitioner's joint returns for 1982 and 1983. Accordingly, petitioner was effectively allowed losses of $ 20,592 for 1982 and $ 18,000 for 1983. In October, 1984, petitioner was a named defendant, along with Hawkey family members, Hawkey entities, and investors therein, in a complaint filed by one John Averna, et al. in the Superior Court for the State of California, County of Orange. The complaint contains various allegations of fraud, negligent misrepresentation, breach of fiduciary duty, and negligence on the part of the Hawkey family members. Petitioner *102 was a named defendant because of a possible interest in the outcome of the lawsuit. Petitioner first met Hildreth in December, 1984. Shortly thereafter, on December 28, 1984, petitioner, Hawkey, and Hildreth held a meeting. Petitioner testified that, after the meeting, Hildreth told her that Hawkey was not an honest man and that her faith in him was not justified. Petitioner testified that, as of that meeting, she could not believe such a thing about Hawkey. Although suspicious, petitioner and her husband still executed partnership documents in accordance with Hawkey's instructions as late as February, 1985. On May 17, 1985, special agents of the IRS simultaneously executed search warrants of the offices of Hawkey and Biff. Following the execution of the search warrants, it became publicly known that the Hawkey's were the subject of a criminal investigation. In May, 1985, petitioner received newspaper clippings from an anonymous sender regarding the above criminal proceedings. Petitioner testified that she found it unbelievable that Hawkey would "do this sort of thing" and that she "didn't believe it until all these things started coming in." Once petitioner saw the newspaper *103 articles, she was "devastated." Petitioner testified that she did not finally feel taken advantage of until the monthly checks from Dickinson stopped in June, 1985. The monthly checks from NDL had stopped in October, 1984. On May 18, 1987, Hawkey pled guilty to one count each of mail fraud, conspiracy to defraud the United States, and aiding and abetting the preparation of a false income tax return. On May 18, 1987, Biff pled guilty to two counts of mail fraud. At the conclusion of the criminal case against the Hawkey's, the government sought and obtained court orders requiring Hawkey and Biff to make restitution to their clients in the amounts of $ 825,000 and $ 75,000, respectively, out of future earnings. On October 14, 1987, petitioner filed a claim against the Hawkey's seeking restitution of all funds invested by petitioner and her husband with Hawkey over the years. OPINION Investment Tax Credit
Petitioner claimed a carryforward of unused ITC from various unspecified partnership entities in the total amount of $ 3,847 on her 1984 return. Petitioner has the burden of proving that she is entitled to the ITC's claimed on her 1984 return. Welch v. Helvering *104 , 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). For partnerships whose taxable years commence after September 4, 1982 (TEFRA partnerships), the determination of partnership items with respect thereto must be determined in partnership level proceedings under section 6221 et seq.Certain small partnerships may be excluded from TEFRA partnerships proceedings (section 6231(a)(1)(B)), as are taxable years for partnerships commencing prior to September 3, 1982. The carryforward of an ITC from a TEFRA partnership would be an affected item (section 6231(a)(5)), which cannot be determined until after an appropriate partnership level proceeding. If any portion of petitioner's alleged carryforward of ITC pertains to a TEFRA partnership, petitioner's entitlement to the ITC would have to be resolved in a partnership proceeding, and this Court in this case has no jurisdiction to make such a determination. However, because the basis for the claimed carryforward on the return is unclear, we cannot find that respondent improperly disallowed any ITC attributable to a TEFRA partnership. Dickinson was a TEFRA partnership for 1983 and 1984. The 1983 return of Dickinson was accepted as filed, but no investment *105 in qualified assets was shown thereon to have been made in 1983. It is not clear when Dickinson's 1984 return was filed. That return does show 1984 investment in qualified assets of $ 37,905 of which petitioner may have had an interest of $ 1,895. But petitioner elected not to claim any ITC attributable to 1984, as only carryforwards are involved herein. Thus, any change in that election must necessarily be made by a request for administrative adjustment (see section 6227), and any issue in regard thereto is outside the jurisdiction of this Court in this case. The statement included with petitioner's 1984 return (quoted on page 9 above) does not change any partnership items to nonpartnership items to give us jurisdiction thereof. See section 6231(b)(1)(A) and (b)(2). To the extent that the claimed ITC is attributable to one or more non-TEFRA partnerships, petitioner must prove (1) the identity of the partnership through which the ITC is claimed; (2) the identity, cost, and date placed in service of any qualifying property; and (3) whether the partnership used the property in a trade or business. This applies to all of NDL's years and Dickinson's 1981 and 1982 years. Petitioner *106 introduced no evidence regarding the source of the ITC's, other than Hildreth's blanket assertion that they were generated by Dickinson and NDL. Petitioner introduced no evidence to establish what qualifying property was acquired, that the property was ever placed in service, or that the property was actually used in a trade or business. No partnership records were presented and no partnership personnel testified. Rather, petitioner's evidence consisted of vague testimony by Ann Hawkey and Susan Hawkey-Bernbrock, neither of whom maintained the partnership records for Dickinson or NDL, nor had any personal knowledge about the activities of the partnerships, or about what equipment, if any, was owned by the respective partnerships. Petitioner testified that neither she nor her husband really understood what the Hawkey partnerships were all about. Furthermore, no evidence was presented to establish that any of the Hawkey partnerships ever conducted business or had any economic substance. Accordingly, petitioner has not substantiated her entitlement to any ITC. Petitioner, however, asserts that, as a result of the settlement agreement between petitioner and Holstein for 1982 and *107 1983, respondent should be estopped from disallowing any ITC carryforwards. The terms of that settlement simply provide no factual basis for petitioner to argue reliance or estoppel. The administrative settlement provided for a complete disallowance of any tax benefits from petitioner's Hawkey investments, in return for deductions equal to 100 percent of the cash out-of-pocket. This resulted in petitioner's being allowed losses of $ 20,592 for 1982 and $ 18,000 for 1983. There was no mention whatsoever of ITC in the agreement. Nevertheless, an administrative settlement is not a closing agreement as contemplated by section 7121 and would not be binding on the parties. Theft Loss
Petitioner asserts that she is entitled to a theft loss in the amount of $ 11,272, pursuant to section 165. This amount was not deducted by petitioner on her 1984 return, which was prepared by Hildreth. This amount consists of a loss in the amount of $ 3,272, which allegedly represents petitioner's adjusted basis in all of her Hawkey investments [8] (except Red Mountain VII) as of December 31, 1984, and $ 8,000, which represents petitioner's basis in the Red Mountain VII partnership. See *108 Bukove v. Commissioner, supra.Petitioner's assertion, concerning the $ 3,272 adjusted basis is based upon an exhibit prepared by Hildreth which was marked for identification, but never received into evidence, due to a sustained hearsay objection. Therefore, petitioner has not established this basis. Section 165(a) generally allows as a deduction any loss "sustained" during the taxable year if "not compensated for by insurance or otherwise." Included among these losses for individuals are losses of property from theft. Sections 165(c)(3) and (e). Whether the taxpayer has sustained a theft loss is determined generally under the law of the jurisdiction in which the loss was sustained. *109 Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956); Luman v. Commissioner, 79 T.C. 846, 860 (1982). Petitioner bears the burden of proof. Viehweg v. Commissioner, 90 T.C. 1248, 1253 (1988); Rule 142(a). Under California law, the crime of theft is the felonious stealing, taking, carrying, leading or driving away the personal property of another or the fraudulent appropriation of property by a person to whom such personal property has been entrusted, or the defrauding of money, labor, or real or personal property of another by false or fraudulent representation or pretense. Cal. Penal Code secs. 484(a) and 490a (West 1988). Petitioner has not proven that any theft loss was sustained in 1984. Petitioner must demonstrate that she entered into a transaction only after having been deceived as to its nature. Estate of Melcher v. Commissioner, 476 F.2d 398 (9th Cir. 1973), affg. a Memorandum Opinion of this Court. Here, petitioner testified that she did not engage in an independent investigation to determine the validity of the Hawkey investments, either by herself or with outside professional advisors. Petitioner *110 was promised a higher rate of return on both the NDL and Dickinson above that which she was receiving from the bank. In addition, petitioner testified that Hawkey enticed her into investing with the lure that she would owe little or no taxes as a result of the investments. It appears to this Court that petitioner invested willingly and only became dissatisfied when the tax benefits were disallowed and the checks finally stopped coming in June, 1985. In addition, theft losses are not deductible until the year of discovery. Sec. 165(e), sec. 1.165-8(a)(2), Income Tax Regs.; McKinley v. Commissioner, 34 T.C. 59, 63 (1960). See Ramsay Scarlett & Co. Inc. v. Commissioner, 61 T.C. 795, 808 (1974), affd. 521 F.2d 786 (4th Cir. 1975). The taxpayer must show the discovery of a loss for which "it can be ascertained with reasonable certainty whether or not * * * reimbursement will be received." Sec. 1.165-1(d)(3), Income Tax Regs; see also sec. 1.165-8(a)(2), Income Tax Regs; Alison v. United States, 344 U.S. 167, 170, 97 L. Ed. 186, 73 S. Ct. 191 (1952). Petitioner was a named defendant in 1984 in a case in which various allegations of fraud *111 were made against Hawkey. Petitioner, Hildreth, and Hawkey met on December 28, 1984. After that meeting, Hildreth informed petitioner that he was uncertain as to the truthfulness of Hawkey and his investments. Notwithstanding Hildreth's admonishments, petitioner continued to place her trust in Hawkey and continued to follow his instructions regarding the signing of partnership documents until at least as late as February, 1985. Petitioner received newspaper clippings regarding the criminal investigations of Hawkey and Biff in May, 1985. Nevertheless, she testified that she did not finally feel taken advantage of until the monthly checks stopped coming in June, 1985. Furthermore, even if petitioner had discovered a theft during 1984, there existed, at least as of December 31, 1984, a reasonable prospect of recovery from the Hawkey's. Secs. 1.165-8(a)(2), 1.165-1(d)(3), Income Tax Regs.; Viehweg v. Commissioner, supra at 1256. Petitioner has not shown that, as of December 31, 1984, she could not have recovered any of her funds from the Hawkey's. Inasmuch as petitioner has not established that she was a victim of theft, that a theft loss was discovered by *112 petitioner in 1984, or that the amount of any theft loss was ascertainable as of December 31, 1984, we hold that petitioner has not met her burden of proof under section 165. [9] We hold for respondent. Section 6651(a)(1)
Respondent determined an addition to tax under section 6651(a)(1) for failure to timely file the 1984 return. However, the stipulation of facts states that "Verdan W. Bukove and Rolene Bukove timely filed a joint tax return for the year 1984 in Fresno, California." We therefore conclude that respondent has conceded this issue, and we hold for petitioner. Sections 6653(a)(1), (2)
Respondent determined additions to tax for negligence under section 6653(a)(1) and (2). Respondent's determination is presumptively correct and must stand unless the taxpayer can establish that she and her husband were not negligent. *113 Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984); Axelrod v. Commissioner, 56 T.C. 248, 258 (1971); Rule 142(a). Respondent contends that petitioner was negligent in 1) making her initial Hawkey investments without adequate investigations; 2) claiming the ITC carryforward on her 1984 tax return, after she knew her Hawkey investments lacked economic substance; 3) intentionally failing to report $ 3,320 of income that she actually received from Hawkey during 1984; and 4) including a misleading statement in her tax return which suggested that her 1984 tax position was approved during a prior audit settlement. Respondent's third point relates to stipulated facts raising an inference that petitioner received $ 3,320 in 1984 from Dickinson in excess of the amounts calculated by Hildreth to be Hawkey income. Not only has respondent not claimed an increased deficiency in regard thereto, but respondent has not shown that such receipts were income. Indeed, respondent has not accepted Hildreth's computation as valid. The deficiency determined by respondent was not due to any alleged underreporting of income and therefore cannot be due to negligence in regard *114 thereto. Similarly, the fourth point is inappropriate. If anything, the statement referred to suggests that due diligence was attempted, albeit perhaps inaccurately. In addition, we do not believe the statement to have been misleading. As to respondent's first two arguments, petitioner contends that she should not be subject to the additions to tax for negligence because she reasonably relied upon Hildreth's advise in filing her 1984 Federal income tax return. The area of ITC carryforwards derived from partnership interests is complicated, and it is reasonable for a taxpayer to solicit and rely upon the advice of a trained professional in this area. After review of the record in this case, we decline to impose the additions to tax for negligence upon petitioner Sections 6659, 6661
Section 6659(a) provides for a graduated addition to tax on an underpayment which is attributable to a valuation overstatement of at least 150 percent of the adjusted basis of any property. Section 6659(c). When a determination is made that a taxpayer is not entitled to a claimed credit and is made without regard to any claim of basis or without findings with respect to fair market value, the *115 addition to tax under section 6659 may be inapplicable because the resulting underpayment may be attributable to reasons other than a valuation overstatement. Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987); McCrary v. Commissioner, 92 T.C. 827, 851-855 (1989). In this case respondent disallowed an ITC carryforward "since you have not established the basis and that you acquired and placed into service during the taxable year any qualifying property used in your trade or business." We have made no findings as to the correct value of any property. Thus, any valuation overstatements were not integral to and inseparable from our disallowance of the ITC. Under these circumstances, the addition to tax under section 6659 is not applicable. See Lynch v. Commissioner, T.C. Memo 1990-575. Alternatively, respondent determined an addition to tax under section 6661(a). Section 6661(a) imposes an addition to tax "If there is a substantial understatement of income tax for any taxable year." Such amounts assessed after October 21, 1986, are in an amount equal to 25 percent of the amount *116 of any underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). A "substantial understatement" is an understatement of tax which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(1). According to the notice of deficiency, the tax required to be shown on the return was $ 6,489. Therefore, in this case a substantial understatement exists if the understatement exceeds $ 5,000. In view of the fact that respondent has agreed that petitioner is eligible for income averaging, it is likely that recomputation of the tax under Rule 155 will reveal an understatement less than $ 5,000. Otherwise, we sustain respondent's determination, as petitioner has not demonstrated why section 6661 should not apply. Section 6621(c)
Respondent determined that petitioner is liable for increased interest computed under the provisions of section 6621(c) on substantial underpayments attributable to tax motivated transactions. The phrase "substantial underpayments attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A, for any taxable year, *117 which is attributable to one or more tax motivated transactions, if the amount of the underpayment for such year exceeds $ 1,000. Section 6621(c)(2). The term "tax motivated transaction" includes any sham or fraudulent transaction. Section 6621(c)(3)(A)(v). A transaction that lacks economic substance is a sham transaction. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. sub nom. without published opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion Patin v. Commissioner, 856 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Petitioner has failed to show that section 6621(c) does not apply. She has not shown that the ITC was not attributable to a sham transaction. Therefore, we hold for respondent. Section 6673
Respondent moved for the imposition of sanctions under section 6673 on the ground that petitioner is litigating positions which are frivolous or groundless. A review of the record leads this Court *118 to conclude that section 6673 sanctions should not be imposed upon petitioner. There was no showing by respondent that petitioner instituted any proceedings before this Court primarily for the purpose of delay, or that any of her positions were frivolous or groundless. Therefore, we deny respondent's motion. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner concedes the tax liability for excess contributions tax on an IRA, in the amount of $ 77. Respondent agrees that petitioner is entitled to income averaging for 1984. Respondent also agrees that petitioner is entitled to a residential energy credit carryforward (from 1982) in the amount of $ 178.↩
3. This Court, without objection, dismissed the Estate of Verdan Bukove for lack of jurisdiction. It should be understood, however, that reference to petitioner's activities generally refers to both husband and wife acting in concert.↩
4. In that case we held that the Bukoves did not prove that Red Mountain VII was engaged in any activity with an actual and honest objective of making a profit. We also held that the Bukoves had failed to prove that they discovered a theft loss, if any, vis-a-vis Hawkey in 1980.↩
5. These returns were received subject to respondent's hearsay objections. Those objections are valid as to the truth of the transactions reflected in the returns. However, the returns are admissable to show the fact of their filings and as to what was shown thereon. Note that section 6222 requires a partner's return to be consistent with the partnership return as to partnership items, in the absence of a disclaimer.↩
6. No details were provided as to the identity and significance of this entity.↩
7. The Form 1065 for NDL for 1982 shows an investment in assets of $ 120,000, with petitioner owning a one-third interest in the partnership. The 1981 Form 1065 for Dickinson shows acquisition of assets of $ 4,193, while the 1982 return shows assets acquired for $ 10,136. Petitioner is shown as having a 5% interest in Dickinson. These are not established facts.↩
8. This amount was apparently computed by combining all payments made to Hawkey, from which all Hawkey receipts and allowed losses were deducted. We note that included in the alleged payments are tax preparation fees to Hawkey, for which deductions may have been allowable under section 212(3) in the year of payment.↩
9. Petitioner has not claimed any capital loss due to the worthlessness of any of the investments. No evidence was submitted which would support such a claim, even if raised.↩