JOHN B. RIEDERICH AND CAROLE M. RIEDERICH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Riederich v. Commissioner
Docket No. 14357-86
United States Tax Court
T.C. Memo 1991-164; 1991 Tax Ct. Memo LEXIS 183; 61 T.C.M. (CCH) 2388; T.C.M. (RIA) 91164; April 10, 1991, Filed *183 Decision will be entered under Rule 155. John B. Riederich, pro se. David W. Sorensen, for the respondent. DAWSON, Judge. GUSSIS, Special Trial Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7443A(b) of the Code and Rule 180 et seq.[1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE Respondent determined the following Federal income tax deficiencies and additions to tax: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
1979
$  3,267
$ 163 - 0 -
- 0 -
$   980
1980
4,747
237 - 0 -
- 0 -
1,424
1982
11,886
-0-
$ 594 * 3,566
*184 In his answer filed July 10, 1986, respondent claimed that petitioners are liable for increased interest under section 6621(d)(4) [now section 6621(c)] for the portion of the deficiency for each of the years 1979, 1980, and 1982 which constitutes a substantial underpayment attributable to a tax motivated transaction. Petitioners have conceded that they are not entitled to the investment tax credit claimed on their returns and amended returns, and they further concede that they are not entitled to the claimed deductions for lease payments or other deductions. At trial, respondent conceded the section 6659 addition to tax, and, in the alternative, asserted the section 6661 addition to tax for the year 1982. The issues remaining for decision are: (1) Whether petitioners are entitled to a theft loss for the amount of their investment in Entertainment Marketing Company Incorporated (EMCI); (2) Whether petitioners are liable *185 for additions to tax for negligence or intentional disregard of rules and regulations under sections 6653(a) for 1979 and 1980, and 6653(a)(1) and (2) for 1982; (3) Whether petitioners are liable for the 1982 addition to tax under section 6661 for substantial understatement of income tax; (4) Whether petitioners are liable for increased interest under section 6621(c) because the transactions with EMCI were tax motivated transactions; (5) Whether petitioners are liable to the United States for a penalty under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. Petitioners were residents of Huntington Beach, California, when the petition herein was filed. During the years in issue, John B. Riederich was employed as a pilot in the United States Air Force, and Carole M. Riederich was employed as a secretary. Neither petitioner had any experience or expertise pertaining to production or marketing of records or any other phase of the recording industry. Petitioner Carole M. Riederich did not take part in this investment decision. All further references to "petitioner" will be a singular reference to John B. Riederich, unless otherwise stated. *186 In December 1982, petitioner entered into a master recording transaction with EMCI. Petitioner was introduced to the EMCI investment by a fellow Air Force pilot, Roy L. Parimore, who was in the process of retiring. Parimore was also involved in selling insurance and real estate. Parimore had no legal training. Parimore contacted petitioner on several occasions, soliciting his investment in EMCI. Parimore received commissions for selling investments in EMCI. Prior to entering into the transaction with EMCI, petitioner reviewed a promotional brochure from EMCI. The promotional brochure was dedicated extensively to the tax benefits to be gained by investing in EMCI. The brochure summarized the purported benefits of the program as follows: TAX HIGHLIGHTS The equivalent of 4 to 1 benefits in the 50% bracket. LEASE PRICE The lease price of each master production will be standard. The master that you lease will depend on what is available in inventory. All masters are leased for seven (7) years at a lease cost of $ 11,500. There are NO NOTES for you, the Lessee to sign, and NO immediate or future liability whatsoever. Your one time payment of $ 11,500 is *187 your total lease cost. A full recourse note of $ 199,000 and cash is EMCI's purchase price and the note is signed by EMCI. The value of the master results in a $ 19,900 investment tax credit that is legally passed through to you the Lessee, at no risk, liability or extra cost to you. OBJECTIVE Our objective in having you, the taxpayer, lease the master production, is for EMCI to finance our entertainment projects with lease funds. Your objective is to earn profit through royalties that are paid to you upon the sale of your master production cassette copies. They can be distributed throughout the United States and worldwide markets wherever audio cassettes are sold. You are the lease holder for seven (7) years and your objective is to give your master the broadest possible exploitive and distributive effort. You can do this many different ways and you can use one of the major cassette distributors recommended by EMCI. REVENUE PROFIT You, the Lessee, are entitled to a 50% royalty on all net proceeds from the sales of copies of your master. A $ 2.50 cassette (wholesale), the distributor would take $ .50. This would leave the $ 2.00 to be divided equally between *188 EMCI and the Lessee. EMCI would use at least 60% of the money to pay back the $ 199,000 note with which it purchased the master. The principal is paid semi-annually; the interest and any remaining principal is due in 1996, or 14 years from the date of purchase. All tapes have a fixed class life of 14 years. The first seven (7) years are absolved by the original lease to the Lessee. During the seven (7) year lease, you, the Lessee, are entitled to a maximum of $ 1.00 per tape sold and 20% on any other ancillary royalties. EMCI, the Lessor receives 50% of the net royalties during this lease period. At least 60% of the royalties EMCI receives are paid against the principal then the interest on the outstanding note. Profit to the Lessee/taxpayer and EMCI can only be received should you distribute your tape successfully. All distribution and exploitation is up to you, the Lessee, during the seven (7) year lease period. EMCI's seven (7) year lease requires you the Lessee to distribute copies of your master production. EMCI remains the owner of the tape. After the first seven (7) years, EMCI has an additional seven (7) years to exploit the tape for profit. Tape sales are projected *189 at approximately 127,000 copies during the first seven (7) years and profit to you, the Lessee, projected at $ 63,000 which is quite substantial. LEGAL STRUCTURE The legal structure of the 1982 EMCI Master Production Program series is quite unique and simple. The production company in essence becomes the producer/seller. EMCI is the purchaser/Lessor. You the taxpayer become the Lessee. The producer/seller sells to EMCI a fully qualified original 15 minute production. EMCI buys this master production for cash and a full recourse promissory note of $ 199,000 with 10% interest per annum; all principal and interest payable upon royalty sales or in 14 years from the date it was made. The full legal purchase price is $ 199,900 which creates a $ 19,900 investment tax credit that EMCI receives. EMCI then becomes the Lessor and leases this master production under the tax laws of the United States. The Lessor (EMCI) passes through to the Lessee/taxpayer the full amount of investment tax credit created by the purchase note ($ 19,900). Please refer to EMCI tax opinion prepared for EMCI set forth in the 1982 full brochure. All inquires on legal structure/tax implications should *190 be directed to the tax law specialist employed by EMCI.
A second brochure from EMCI providing details of the 1982 master production program was also reviewed by petitioner. Primary emphasis in this brochure was on the tax benefits and tax aspects of the program. Petitioner invested in EMCI in late December, 1982. On December 21, 1982, petitioner executed a document entitled "LEASE AGREEMENT" that stated, among other things, that petitioners were leasing from EMCI for a period of seven years a master audio cassette tape recording entitled God's Arithmetic and God's Love Revealed for use throughout the world. The initial investment of $ 11,500 was deemed to be prepaid rental for the full seven year term of the lease. Petitioner did not listen to the recording before executing the lease. He did not get a copy of any of the other master recordings that were being leased by EMCI. Petitioner never asked to review any of the EMCI statistical information to determine whether any prior recordings in prior years produced a profit. Prior to leasing the master recording, petitioner did not attempt to verify any appraisal of his master recording. The sales price for all master recordings *191 to be purchased from the production company by EMCI and leased to investors was identical, regardless of the title or the narrator involved in a particular master recording. Petitioner did not designate the topic or subject matter of the master recording leased by him. Nor did petitioner designate the artist who narrated the master recording. The master recording designated for petitioner was called God's Arithmetic and God's Love Revealed and consisted of readings from the Bible. At or about the time petitioner executed the lease agreement in December 1982, he also contracted for 1,000 copies of the master recording which were to be distributed over the seven-year lease period. Petitioner was never provided with the master recording purportedly leased by him. In August 1984 he received a copy of the tape purportedly produced from the master recording, but he was never able to verify that the 1,000 copies of the tape they contracted for were ever produced. On his return for 1982 petitioner claimed the master recording as qualified investment property in the amount of $ 199,000. He claimed a tentative regular investment credit in the amount of $ 19,900, of which $ 11,886 was *192 used to offset his income tax liability for 1982. He filed amended returns for the tax years 1979 and 1980 in which he carried back the investment tax credit and claimed refunds in 1979 and 1980 in the respective amounts of $ 3,267 and $ 4,747. OPINION Petitioner concedes that he is not entitled to the investment tax credit claimed on his returns and amended returns for the years involved and that he is not entitled to the deduction claimed for lease payments or other expenses. Petitioner's argument that he reached a valid and enforceable settlement agreement for a reduced amount of deficiencies is not supported by the record. The record indicates that petitioner failed to properly accept the settlement offer as made by respondent. In short, the basic elements of an enforceable contract, a valid offer and acceptance, are not satisfied. Petitioner's contention is without merit. On this record, respondent's determinations of deficiencies for the years at issue as reflected in the statutory notice of deficiency must be sustained. Section 165
Petitioner contends that he is entitled to a deduction in 1982 under section 165(c)(3) for a theft loss in the amount of $ 13,000 *193 with respect to his investment in the EMCI transaction. For Federal income tax purposes, the issue of whether a theft loss occurred must be determined by the law of the state where the loss was sustained. Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). To sustain a theft loss deduction with respect to amounts paid in connection with a scheme to avoid taxation, the taxpayer must demonstrate that he entered into the transaction only after having been deceived as to its nature. West v. Commissioner, 88 T.C. 152, 163 (1987). Petitioner has the burden of proof. Rule 142(a). Petitioner cites Cal. Penal Code sec. 484 (West 1988), which provides in relevant part that "Every person who shall * * * knowingly, and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor, or real or personal property, * * * is guilty of theft." On this record there is no persuasive evidence to show that petitioner suffered a theft. He purchased a package of purported tax benefits with many of the attendant risks delineated in the EMCI *194 materials. Petitioner took those risks voluntarily. There is no showing that petitioner was misled or deceived with respect to the transaction he embarked upon. The EMCI materials, which outlined the tax benefits, also focused upon the likelihood of an attack by the Commissioner. In short, petitioner in this case appears to have received exactly what he paid for. See Marine v. Commissioner, 92 T.C. 958, 978 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Viehweg v. Commissioner, 90 T.C. 1248, 1255 (1988); see also Horn v. Commissioner, 90 T.C. 908, 940-941 (1988); Shelton v. Commissioner, T.C. Memo 1988-351. Accordingly, we conclude that petitioner is not entitled to a theft loss deduction with respect to the EMCI transaction. Section 6653
Sections 6653(a) and 6653(a)(1), as applicable, impose additions to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2), as applicable, imposes an addition to tax in the amount of 50 percent of the *195 interest due on the portion of the underpayment attributable to negligence. For the purposes of these sections, negligence is the failure to use due care or to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner has the burden of proof. Rule 142(a). The failure of petitioner to make a meaningful investigation beyond the promotional materials supplied by the sales person or to consult independent advisors was not reasonable or in keeping with the standard of the ordinarily prudent person. Laverne v. Commissioner, 94 T.C. 637, 652 (1990). Petitioner did not seek advice from any persons with expertise in the master recording leasing field. He did not seek the advice of an independent expert or lawyer. Petitioner testified he contacted his accountant prior to investing, but there was no testimony regarding the nature of the accountant's expertise, the advice rendered by the accountant, or what information the accountant used, if *196 any, to give an opinion. The thrust of petitioner's argument is that he relied upon the expert advice of Parimore. Parimore was a salesman for EMCI. He was not an expert in the master recording field. Nor did he profess to have any expertise in accounting or in the legal field. Parimore's self-proclaimed status as a financial planner is based upon what he referred to as his "personal study." It is evident that Parimore was not competent to render an expert and informed opinion regarding the profit potential of the EMCI program or to properly gauge the legal and tax aspects of the program. In view of petitioner's long acquaintance with Parimore, who retired from the Air Force in 1983, the scope of Parimore's background should have been known to petitioner or, at any rate, readily available. Under these circumstances petitioner's reliance on Parimore for the business and tax aspects of the EMCI transaction was not reasonable. See United States v. Boyle, 469 U.S. 241, 250, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985); see also Rogers v. Commissioner, T.C. Memo 1990-619. Prior to investing in EMCI, petitioner did not attempt to contact any of the officers or the principals *197 of EMCI. He did not attempt to get a copy of any master recordings that were already being leased by EMCI. Petitioner did not select the topic or the particular celebrity featured in petitioner's master recording. In short, petitioner's whole approach to the business and investment merits of the EMCI program was characterized by a marked indifference. The record is completely devoid of even a colorable argument by petitioner that he exercised due diligence before making an investment of this magnitude. Petitioner's proposed profit objective in participating in the EMCI transaction lacks credence. Petitioner places considerable emphasis on the fact that one of the pilots in his squadron was an entertainer who informed petitioner that the list of stars listed by EMCI in the brochure was impressive. This casual fragment of information could hardly serve as a credible justification for entering into the EMCI program. Nor does petitioner's contract with the law firm originating the tax opinion found in the EMCI brochure rise to the level of due diligence in weighing the merits of the program. Petitioner's readiness to accept the promises of the master recording leasing program, *198 which on its face was too good to be true, belies petitioner's contention that he acted reasonably. We conclude on this record that petitioner is liable for the additions to tax imposed by sections 6653(a), 6653(a)(1) and 6653(a)(2). Section 6661
Respondent, in his amended answer, asserted an addition to tax under section 6661 for the taxable year 1982. Respondent has the burden of proof. Rule 142(a). Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is defined as the excess of the amount of tax required to be shown on the tax return over the amount of tax actually shown on the return as filed less any rebates. A substantial understatement is one that exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). The amount of the understatement may be reduced by an amount for which there was substantial authority for the treatment adopted by a taxpayer on his return. Sec. 6661(b)(2)(B)(i). This reduction is not available in the case of a tax shelter unless in addition the taxpayer reasonably believed *199 that the claimed tax treatment was "more likely than not" the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other entity or investment plan or arrangement or any other plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax. Here it is clear that the only purpose of the master recording leasing program was the avoidance or evasion of Federal income tax. The master recording in question was never produced by EMCI or by petitioner. The record clearly establishes that the transaction was completely without economic substance and was simply a sham. We so conclude. Petitioner has not shown that he reasonably believed that the tax treatment he claimed with respect to his participation in the EMCI master recording leasing program was more likely than not the proper tax treatment. On this record we must sustain respondent on this issue. Section 6621(c)
Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6601 if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) *200 in any taxable year attributable to one or more "tax motivated transactions." The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Among the transactions enumerated in the statute as "tax motivated" is "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). Petitioner admits that the transaction was a sham. We conclude on this record that the master recording leasing program in question represented a factual sham, and we therefore hold that section 6621(c) is applicable. Respondent is sustained. Section 6673
We next consider respondent's request for imposition of a penalty under section 6673. That section provides for a penalty not to exceed a certain amount (now $ 25,000) payable to the United States when it appears to the Tax Court that proceedings before it have been instituted or maintained primarily for delay, or that the taxpayer's position in such proceedings is frivolous or groundless, or that the taxpayer unreasonably failed to *201 pursue available administrative remedies. It is apparent that the master recording leasing transaction involved here was spurious and completely devoid of economic substance. This Court has previously considered and rejected as meritless strikingly similar tax shelter schemes involving a master recording leasing program which we deemed to be totally lacking in economic substance. Apperson v. Commissioner, T.C. Memo 1987-571, affd. without published opinion 908 F.2d 975 (7th Cir. 1990); see also McCrary v. Commissioner, 92 T.C. 827 (1989). We do not absolve petitioner from his obligation to look behind the benefits promised in the offering materials. Accordingly, in the exercise of our discretion and on this record, we impose a penalty of $ 1,500 in this case. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment of $ 11,886 attributable to negligence.↩